ELLEN F. ROSENBLUM
Attorney General
SHEILA H. POTTER  #993485
Deputy Chief Trial Counsel
STEVEN M. LIPPOLD, OSB #903239
Chief Trial Counsel
Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email:  Sheila.Potter@doj.state.or.us
            Steve.Lippold@doj.state.or.us

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| ELLEN F. ROSENBLUM, Oregon Attorney General, | Case No.  3:20-cv-01161-MO |
|---|---|
| Plaintiff, | MOTION FOR TEMPORARY RESTRAINING ORDER |
| v. | |
| JOHN DOES 1-10; the UNITED STATES DEPARTMENT OF HOMELAND SECURITY; UNITED STATES CUSTOMS AND BORDER PROTECTION; the UNITED STATES MARSHALS SERVICE and the FEDERAL PROTECTIVE SERVICE, | **ORAL ARGUMENT REQUESTED** |
| Defendants. | |

# TABLE OF CONTENTS

I.  MOTION ................................................................................................................... 1

II. MEMORANDUM OF POINTS AND AUTHORITIES ........................................... 1

    A.  FACTUAL BACKGROUND ....................................................................... 2

        1.  Federal troops were detailed to Portland to respond to the city's protests .......................................................................................... 3

        2.  Federal troops begin pulling protesters off the street and putting them in unmarked vehicles ........................................................... 3

        3.  Defendants' statements indicate intention to continue detentions unabated .......................................................................................... 5

    B.  LEGAL STANDARD ................................................................................. 7

    C.  ARGUMENT .............................................................................................. 8

        1.  Attorney General's authority to act here ...................................... 8

        2.  Likelihood of success on the merits ............................................ 11

            a.  Defendants' conduct interferes with First Amendment rights ................................................................................. 11

            b. Defendants' actions violate the Fourth Amendment .......................... 14

        3.  Irreparable harm ......................................................................... 18

        4.  The balance of equities supports issuing an injunction ............................ 18

        5.  The public interest supports restraining Defendants' conduct................. 19

III. CONCLUSION ........................................................................................................ 20

Page i

**L.R. 7-1 Certification**

Plaintiff conferred on this Motion with counsel for the Defendant agencies by telephone on July 20, 2020, and the parties could not reach an agreement requiring the court to resolve the matter.

## I.    MOTION

Pursuant to Fed. R. Civ. Pro. 65, Plaintiff Ellen Rosenblum, Attorney General of the State of Oregon, moves this court for a temporary restraining order prohibiting Defendants from taking actions that exceed their authority, misrepresent their authority, and present a clear and present danger to the health and welfare of Oregon citizens and the peace and order of the State, specifically an order requiring that Defendants:

   a)    Immediately cease detaining, arresting, or holding individuals without probable cause or a warrant; and

   b)    Identify themselves and their agency before detaining or arresting any person; and

   c)    Explain to any person detained or arrested that the person is being detained or arrested and explain the basis for that action.

The Attorney General also asks the Court to immediately order Defendants to show cause why a preliminary injunction should not issue to continue each of the above restraints during the pendency of this action.

The Court has jurisdiction to grant a temporary restraining order because the State of Oregon and its inhabitants will suffer irreparable harm if Defendants continue the course of conduct alleged in the Complaint. In support of this motion, the Attorney General relies upon the Complaint, the Declarations of Sheila Potter, Mark Pettibone, Tiffany Chapman, Stephanie Debner, Jennifer Arnold, Terri Preeg-Riggsby, and the following points and authorities.

## II.    MEMORANDUM OF POINTS AND AUTHORITIES

The Attorney General seeks extraordinary relief from the Court under extraordinary circumstances. In the small hours of the morning last Thursday, an armed group of

Page 1 -    MOTION FOR TEMPORARY RESTRAINING ORDER

unidentifiable men in an unmarked vehicle snatched Mark Pettibone, a Portland resident, off the Portland streets, without explanation. This did not happen by accident, but pursuant to a federal strategy to terrorize Portland protestors, presumably in an effort to quell ongoing protests. Videos online reflect that Mr. Pettibone is not the only protester forcibly removed from the Portland streets and shoved into an unmarked car, without explanation.  The Attorney General of Oregon now asks the federal courts to answer whether the United States Constitution permits federal law enforcement to snatch people in the middle of the night without identifying themselves or explaining the legal basis for their actions. She submits that the answer is no, and asks that this Court immediately enjoin federal officers from assuming the aspect of a disappearance squad.

Federal officers have occupied portions of Portland, Oregon, ostensibly to protect federal property.  There is no question that they have the right to protect federal buildings.  But these officers have also pursued peaceful, unarmed citizens through city streets and used unlawful intimidation tactics to instill fear of violence and chill the exercise of rights protected by both the Oregon Constitution and the United States Constitution.

These actions, if not restrained, will further escalate and incite violent confrontations with Oregon citizens attempting to exercise their First Amendment rights to assemble and peacefully protest.  And these actions open the door to the risk of outright kidnapping of protesters by private citizens, as word spreads that genuine law enforcement agents are engaged in such tactics.  The evidence shows that the actions of these federal officers are inconsistent with Constitutional standards and the public statements of federal officials establish that these actions are undertaken for improper political purposes.

## A.    FACTUAL BACKGROUND

Americans across the country have demonstrated daily for racial justice and in protest against racism and acts of police violence since the death of George Floyd in Minneapolis.

Page 2 -    MOTION FOR TEMPORARY RESTRAINING ORDER

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Protests in Portland have occurred both during daylight hours and at night, many of the protests occurring near and centered around the Justice Center and Mark O. Hatfield Federal Courthouse.

**1.   Federal troops were detailed to Portland to respond to the city's protests.**

Various news sources have reported that federal law enforcement was sent to Portland in or around late June or early July. On June 26, President Donald Trump signed an Executive Order on Protecting American Monuments, Memorials, and Statues and Combating Recent Criminal Violence, fulminating against the protests in American cities, and giving federal law enforcement and military leave to "assist" in protecting federal property for the next six months:

> Upon the request of the Secretary of the Interior, the Secretary of Homeland Security, or the Administrator of General Services, the Secretary of Defense, the Attorney General, and the Secretary of Homeland Security shall provide, as appropriate and consistent with applicable law, personnel to assist with the protection of Federal monuments, memorials, statues, or property.  This section shall terminate 6 months from the date of this order unless extended by the President.

Acting Secretary of the Department of Homeland Security Chad Wolf announced on July 3 that DHS was "following [President Trump's] lead in deploying special units to defend our national treasures from rioters."  Oregon Public Broadcasting has reported that, beginning July 1, "Federal officers started playing a more obvious and active role during nightly protests in Portland, pulling protesters' attention away from the Multnomah County Justice Center and refocusing it across the street on the Mark O. Hatfield Federal Courthouse. That night, federal officers emerged from the boarded-up courthouse to fire pepper balls at demonstrators who came too close to the building. Their appearance changed the protests."  The Willamette Week has reported the presence of federal officers at the protests "since at least July 2."

**2.   Federal troops begin pulling protesters off the street and putting them in unmarked vehicles.**

Beginning last week—the week of July 13, 2020—federal officers appear to have moved beyond merely firing projectiles at demonstrators and begun grabbing protesters, pulling them off the sidewalks of downtown, and shoving them into unmarked vehicles. Mark Pettibone has

Page 3 -   MOTION FOR TEMPORARY RESTRAINING ORDER
SP3/db5/#10342023-v1

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

prepared a sworn Declaration detailing his experience with anonymous men who turned out to be federal officers of some kind. (*See* Decl. of Mark Pettibone.)

In his Declaration, Mr. Pettibone explains that he took part in a peaceful Black Lives Matter demonstration the night of July 14 and, while walking home around 2:00 a.m. on the morning of July 15, "[w]ithout warning, men in green military fatigues and adorned with generic 'police' patches, jumped out of an unmarked minivan and approached me.  I did not know whether the men were police or far-right extremists, who, in my experience, frequently don military-like outfits and harass left-leaning protesters in Portland. My first thought was to run. I made it about a half-block before I realized there would be no escape from them. I sank to my knees and put my hands in the air." (*See id.* at ¶¶ 2-5.)

The unidentified men forcibly transported Mr. Pettibone to what turned out to be the federal courthouse.  He was read his Miranda rights and declined to waive them, after which he was eventually released. No one ever told Mr. Pettibone why he had been detained.  To his knowledge no charges were made and no physical record of his arrest or detainment exists. He does not know whether he has been charged with a crime. (*See* id. at ¶¶ 6-7.)

Two other, similar incidents have been captured on videos available online.  In one widely circulated video, two men in camouflage military-style uniforms and "POLICE" patches stride across a street and up to a man wearing black standing on a sidewalk, with his hands up. The uniformed men—who do not identify themselves, but are presumed to have been federal officers, due to the resemblance of their uniforms to that of other federal officers out that night— immediately bind the man's hands and without a word lead him to an unmarked minivan, put him in the van, and drive away, as onlookers plead for them to identify themselves or say where they are taking the man.

Defendant U.S. Customs and Border Protection issued a statement on July 17, 2020 that appears to respond to that video and reads in relevant part:

> CBP agents had information indicating the person in the video was suspected of assaults against federal agents or destruction of federal property.  Once CBP

Page 4 -    MOTION FOR TEMPORARY RESTRAINING ORDER
SP3/db5/#10342023-v1

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

agents approached the suspect, a large and violent mob moved towards their location.  For everyone's safety, CBP agents quickly moved the suspect to a safer location for further questioning.  The CBP agents identified themselves and were wearing CBP insignia during the encounter. The names of the agents were not displayed due to recent doxing incidents against law enforcement personnel who serve and protect our country.

The video of that unknown person's detention shows no evidence of a "mob" at all, let alone the agents appearing to note or react to a "large and violent mob" approaching them. Rather, the agents walk up, put the man's hands together over his head, and *immediately* turn and walk him back to their vehicle. The video has sound and does not reflect the agents identifying themselves or saying anything at all. No insignia are visible on the video.

In yet another video, men in street clothes wearing black vests with the word "POLICE," and no visible identifying information haul a woman into the back of their van and drive away, over the screams of onlookers.  The video begins with the woman already on her stomach in the street with men kneeling around her. As the video progresses the unidentified armed men yank her onto her feet and force her into a vehicle.  Onlookers scream questions at the men, asking who they are, where they are taking the woman, and why they're taking her away. One of the men, pointing what appears to be a gun at the onlookers, shouts "You follow us, you will get shot, you understand me?"  The identity of the woman is not known to the Attorney General. The Attorney General must assume the Defendants were responsible, based on the similarity of the tactics in that second video to those in the first, as well as to Mr. Pettibone's report of his seizure and detention. Without the "POLICE" marking on the assailants' vests, the video would appear to be of an armed kidnapping.

### 3.    Defendants' statements indicate intention to continue detentions unabated.

Statements by federal officials, including the Acting U.S. Customs and Border Protection Commissioner, the Acting Secretary of the Department of Homeland Security, the Acting Deputy Secretary of the Department of Homeland Security, and the President indicate Defendants are unlikely to stop these tactics in the absence of a court compelling them to do so.

Page 5 -    MOTION FOR TEMPORARY RESTRAINING ORDER

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

The Executive Order issued June 26 directs federal law enforcement and troops to "protect" federal property for a period of six months.  That Executive Order reads, in part:

> In the midst of these attacks, many State and local governments appear to have lost the ability to distinguish between the lawful exercise of rights to free speech and assembly and unvarnished vandalism.  They have surrendered to mob rule, imperiling community safety, allowing for the wholesale violation of our laws, and privileging the violent impulses of the mob over the rights of law-abiding citizens.  Worse, they apparently have lost the will or the desire to stand up to the radical fringe and defend the fundamental truth that America is good, her people are virtuous, and that justice prevails in this country to a far greater extent than anywhere else in the world.  Some particularly misguided public officials even appear to have accepted the idea that violence can be virtuous and have prevented their police from enforcing the law and protecting public monuments, memorials, and statues from the mob's ropes and graffiti.

> My Administration will not allow violent mobs incited by a radical fringe to become the arbiters of the aspects of our history that can be celebrated in public spaces.  State and local public officials' abdication of their law enforcement responsibilities in deference to this violent assault must end.

At a press conference last week, the President is reported to have said, "We've done a great job in Portland… Portland was totally out of control, and they went in, and I guess we have many people right now in jail. We very much quelled it, and if it starts again, we'll quell it again very easily. It's not hard to do, if you know what you're doing."

Willamette Week also reported that, during the same speech, "Trump condemned rising gun violence in liberal cities, which he said was a result of defunding police departments. He vowed to 'take over' if such violence continues to rise…. 'Things are happening that nobody's ever seen happen in cities that are liberally run. I call them radical-lib. And yet they'll go and march on areas and rip everything down in front of them.'"

Likewise, Defendant U.S. Customs and Border Protection issued a statement on Friday July 17, reading:

> While the U.S. Customs and Border Protection (CBP) respects every American's right to protest peacefully, violence and civil unrest will not be tolerated.  Violent anarchists have organized events in Portland over the last several weeks with willful intent to damage and destroy federal property, as well as injure federal officers and agents. These criminal actions will not be tolerated.

\* \* \*

Page 6 -    MOTION FOR TEMPORARY RESTRAINING ORDER

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

The Department of Homeland Security (DHS) and its components will continue to work tirelessly to reestablish law and order.  The Federal Protective Service (FPS) is the lead government agency that CBP personnel are supporting.  CBP personnel have been deployed to Portland in direct support of the Presidential Executive Order and the newly established DHS Protecting American Communities Task Force (PACT).  CBP law enforcement personnel have been trained and cross designated under FPS legal authority 40 U.S.C. § 1315."

OPB has reported that Acting U.S. Customs and Border Protection Commissioner Mark

Morgan called the protesters criminals on Fox News, and said:

"I don't want to get ahead of the president and his announcement, but the Department of Justice is going to be involved in this, DHS is going to be involved in this; and we're really going to take a stand across the board. And we're going to do what needs to be done to protect the men and women of this country."

Kenneth Cuccinelli, Acting Deputy Secretary of the Department of Homeland Security, is

reported to have told the Washington Post on Sunday, June 19, that "the agency had deployed

tactical units from U.S. Immigration and Customs Enforcement and U.S. Customs and Border

Protection" to Portland and other cities.  He told the Post that he and his agency "don't have any

plans" to remove officers from Portland:

"When the violence recedes, then that is when we would look at that," he said. "This isn't intended to be a permanent arrangement, but it will last as long as the violence demands additional support to contend with."

## B.    LEGAL STANDARD

In a June 9, 2020, Order granting a motion restraining Portland police from using tear gas

inconsistently with the Police Bureau's own rules, United States District Judge Marco A.

Hernandez set forth the applicable legal rules governing issuance of a temporary restraining

Order.

The standard for a temporary restraining order (TRO) is "essentially identical" to the standard for a preliminary injunction....

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Am. Trucking Ass'n Inc. v. City of L.A.*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 21 (2008)). "The elements of [this] test are balanced, so that a stronger showing of one element may offset a weaker showing of another. For example, a stronger showing of irreparable harm to plaintiff might offset a lesser

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

showing of likelihood of success on the merits." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

Order at 4, *Don't Shoot Portland v. City of Portland*, No. 20-cv-00917-HZ (D. Or. June 6, 2020), ECF No. 29 (some internal citations omitted for space).  The moving party must show a likelihood of success on the merits, the likelihood of irreparable harm without an order of restraint, the balance of equities favors the restraint, and that the relief requested is in the public interest.  *Winter,* 555 U.S. at 20.

## C.    ARGUMENT

Federal officers have demonstrated willingness to circumvent constitutional standards and public statements by federal law enforcement officials have condoned excessive and intimidating tactics widely reported over the past week. The harm to Oregonians lies in both the impact on individuals' free exercise of their constitutional rights, including First Amendment rights of free expression and assembly, Fourth Amendment rights to be free of unreasonable search and seizure, Fifth Amendment due process rights, and in the harm to the State in its sovereign interests in maintaining public safety and order. This Court should grant the restraining order sought here. The Attorney General is likely to succeed on the merits of this case, and the people of Oregon will be irreparably harmed without the restraint sought. The balance of equities and the public interest clearly favor the issuance of an order.

### 1.    Attorney General's authority to act here.

The Oregon Attorney General is compelled to bring this case because the Defendant agencies have made it clear that they intend to continue their conduct in the absence of a court order.  It should not be necessary to petition this Court for an order preventing federal officers from grabbing pedestrians off the street, shoving them into cars, and driving away with them, without the officers identifying themselves and their agency, or otherwise taking the steps necessary for a lawful detainment.  But Defendants have made it necessary.

The safety and well-being of Oregonians is plainly at risk under the circumstances created by Defendants.  There is no way for an individual Oregonian to determine whether she is

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

being arrested or kidnapped, when she is seized using the tactics adopted by these

Defendants.  When federal officers simply walk up, grab someone, and push that person into a

car—failing to identify themselves, failing to tell the person why the officers are placing her

under arrest, failing to create a paper record to allow her to ever to know what happened to her

and who did it—they are duplicating the circumstances of a kidnapping. As a result, not only are

the officers violating the law, but they are damaging the State of Oregon in two distinct ways as

a result: first, people are at greater risk now of being victimized by genuine kidnappers.  And,

second, Oregonians are now at greater risk of state violence if they reasonably resist what they

believe is a kidnapping.

The State itself is damaged by the Defendants' violence on its streets, and this Court's

intervention is urgently needed to redress that damage. Whether federal agencies are acting in a

manner permitted by federal law or lawlessly—and thus potentially subject to state regulation—

is a federal question that must be answered by this Court.  The State is also damaged by the ease

with which the tactics now being deployed by federal law enforcement can be mimicked creates

an increased risk of horrific crimes being committed by private citizens who oppose the protests.

In addition, there is a significant risk that individuals will be shot or beaten on the street by

federal agents, for fighting off people they reasonably believed to be criminals.

The federal government has made it clear that it has no intention of withdrawing the

officers or changing its tactics.  The President has crowed about his perception of his officers'

success in Portland.  The only way this will end is if this Court orders the officers to obey the

law, identifying themselves appropriately and carrying out arrests in a manner consistent with

their obligations under the Constitution. The Attorney General asks the Court to do just that.

Beyond the Attorney General's role as the chief legal officer for the State of Oregon, she

also has the right to speak for the people of her state.  American courts have recognized that

states as "*parens patriae*"—the parent of the citizens—have particular interests in the well-being

of their populace.  *Aziz v. Trump*, 231 F. Supp. 3d 23, 30 (E.D. Va. 2017) (quoting *Alfred L.*

Page 9 -    MOTION FOR TEMPORARY RESTRAINING ORDER

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

*Snapp & Son., Inc. v. Puerto Rico*, 458 U.S. 592, 600 (1982)).  The *Aziz* court found that a state could bring a *parens patriae* action against the federal government "when the state has grounds to argue that [an] executive action is contrary to federal statutory or constitutional law."  *Id.*

"A state has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general." *Snapp & Son.*, 458 U.S. at 600 (1982) These interests can include protecting its citizens from public nuisances. *See Dep't of Fair Emp't & Hous. v. Lucent Techs., Inc.*, 642 F.3d 728 (9th Cir. 2011).  Protection of a state's residents from unconstitutional acts by federal law enforcement also falls within a state's interest in the well-being of its citizenry; the state has more than a nominal interest in bringing an end to such conduct.

The Southern District of Texas noted a line of cases demonstrating that states may sue the federal government *in parens patriae* where the state brought the action to *enforce* the rights guaranteed by a federal statute, rather than to protect its citizens *against* a federal statute:

> Defendants' succinct argument, however, ignores an established line of cases that have held that states may rely on the doctrine of *parens patriae* to maintain suits against the federal government. *See, e.g., Wash. Utilities and Transp. Comm'n v. F.C.C.*, 513 F.2d 1142 (9th Cir. 1975) (state regulatory agency relied on parens patriae to bring suit against F.C.C. and U.S.); *Kansas ex rel. Hayden v. United States*, 748 F. Supp. 797 (D. Kan. 1990) (state brought suit against U.S. under parens patriae theory); *Abrams v. Heckler*, 582 F. Supp. 1155 (S.D.N.Y. 1984) (state used *parens patriae* to maintain suit against the Secretary of Health and Human Services). These cases rely on an important distinction. The plaintiff states in these cases are not bringing suit to *protect* their citizens *from* the operation of a federal statute—actions that are barred by the holding of *Massachusetts v. Mellon*. Rather, these states are bringing suit to *enforce* the rights guaranteed by a federal statute. Id.

*Texas v. U.S.*, 86 F. Supp. 3d 591, 626 (S.D. Tex. 2015) (emphasis in original).

In the present case, Oregon has an interest in the civic and physical wellbeing of its people whose liberty interests are will be restrained by unconstitutional stops and detentions by federal officers roaming its streets.  In addition, these stops threaten to create a significant chilling effect upon its citizens' First Amendment rights of free speech, as citizens choose to stay home in fear of being snatched up without warning by federal authorities, rather than exercise their freedoms of speech and assembly by participating in peaceful protests.

Page 10 -  MOTION FOR TEMPORARY RESTRAINING ORDER

Should the practice of the Defendants continue in Oregon, such that arrests resemble kidnappings, public confidence in constitutional exercise of law enforcement will be diminished. If not restrained, further such actions could also impose post-event investigation and prosecution costs upon the State, which will divert its resources of staff and money from other tasks.

      **2.**      **Likelihood of success on the merits.**

The Attorney General is likely to succeed on the merits of her lawsuit against the federal agencies and John Does.  Defendants' conduct runs afoul of First Amendment protections (discussed in section a., below) as well as Fourth Amendment (due process) protections.

      **a.**      **Defendants' conduct interferes with First Amendment rights.**

Oregonians have the right to move about in public places, including but not limited to engaging in activities protected by the First Amendment, without fear of unlawful detention by federal officers concealing their identity, silently grabbing them and shoving them into cars without explanation, seemingly without probable cause for arrests.  Defendants have created legitimate reasons for people in Portland to fear for their personal safety and the integrity of their constitutional rights by the conduct of federal agents.

Creating a climate of fear and intimidation associated with exercising First Amendment rights affects vulnerable citizens in particular. Individuals with disabilities, sole earners, single parents, and others may be particularly unwilling to risk the trauma and disruption to their families of being snatched off the streets. People wishing to come to downtown Portland to bear witness and uplift the voices of Black Lives Matter activists would have every reason to be fearful of doing so. (*See* Declarations of Tiffany Chapman, Stephanie Debner, and Terri Preeg-Riggsby.)

The right to assemble and speak out in protest against the actions of governmental actors is one of the foremost rights of American citizens. This Court recently held, in the *Don't Shoot Portland* case, that demonstrations and protests are protected speech:

> Organized political protest is a form of "classically political speech." *Boos v. Barry*, 485 U.S. 312, 318 (1988). "Activities such

SP3/db5/#10342023-v1

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

as demonstrations, protest marches, and picketing are clearly
protected by the First Amendment." *Collins v. Jordan*, 110 F.3d
1363, 1371 (9th Cir. 1996).

Order at 6, *Don't Shoot Portland, supra.*

An illustrative case is *Johnson et al. v City of Berkeley et al.*, 2016 WL 928723 (2016). In

that case, local law enforcement monitored a protest march.  Plaintiffs alleged that they had

peacefully participated in the demonstration either as protesters or journalists documenting the

march.  Law enforcement officers allegedly struck them with batons repeatedly, and in some

instances, deployed tear gas.  Two plaintiffs were arrested and spent the night in jail although

they had done nothing wrong.  In a civil case against the officers, the District Court denied the

defense motion to dismiss the First Amendment claims because the allegations sufficiently stated

a First Amendment violation.  The court found that plaintiffs' alleged actions of protesting

constituted clear First Amendment activity and that law enforcement's alleged response was

clearly intended to have a chilling effect on plaintiffs' freedom of expression.  *See also*

*Rodriguez v. Winski*, 973 F. Supp. 2d 411 (S.D.N.Y. 2013) ("[Defendant] arrested [plaintiff]

during his participation in a protest. Hence, [plaintiff's] expressive activity was not merely

chilled, but was rather completely frustrated for the period of his arrest." *Id*. at 427).

Americans are entitled to express frustration, disapproval, profound disagreement, and

even contempt for their government. Defendants may disagree with these sentiments, but they

are not entitled to use the power of their office to discourage, intimidate, or retaliate against

people expressing them.  "[T]he First Amendment protects a significant amount of verbal

criticism and challenge directed at police officers." *City of Houston v. Hill*, 482 U.S. 451, 461

(1987).  "The freedom of individuals verbally to oppose or challenge police action without

thereby risking arrest is one of the principal characteristics by which we distinguish a free nation

from a police state." *Id.* at 462-63.  Damage to buildings, of course, may result in criminal

charges—the right of expression does not extend to vandalism of county or federal property.  But

vandalism of federal buildings does not allow Defendants to operate outside their constitutional

limitations.

Page 12 -  MOTION FOR TEMPORARY RESTRAINING ORDER

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

*City of Houston* makes clear the notion that conduct can be offensive to and critical of law enforcement and still be constitutionally protected. Moreover "a properly trained officer may reasonably be expected to 'exercise a higher degree of restraint' than the average citizen, and thus be less likely to respond belligerently to "fighting words."" *Id.* (quoting *Lewis v. City of New Orleans*, 415 U. S. 130, 135 (1974)) (Powell, J., concurring) (citation omitted).

To be sure, a showing of a First Amendment violation requires not only a deterrence but also that such deterrence was "a substantial or motivating factor in [the defendant's] conduct.'" *Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1300 (9th Cir. 1999) (alterations in the original) (quoting *Sloman v. Tadlock*, 21 F.3d 1462, 1469 (9th Cir. 1994). The Defendants' response to the Black Lives Matter movement in Portland is not just belligerent but repressive. Oregon residents downtown at night, away from any federal property, now have reason to fear that they may find themselves in an unmarked car, in an unknown location, surrounded by heavily armed individuals. "As a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (brackets and quotation marks omitted). The statements of federal officials, quoted above, mischaracterizing protests and other constitutionally protected assembly in Portland strongly suggest that the Defendants' objective is in fact to disrupt the protests themselves, and to deliver a message to the people of this country that dissent will be met with force.

Officers may be found to have engaged in retaliation for protected speech when arresting people, even if the officer had probable cause for the arrest (and here, nothing indicates that Defendants are in fact establishing probable cause before grabbing pedestrians off the street). Although a plaintiff *ordinarily* cannot bring a retaliatory-arrest claim if the officer had probable cause, "the no-probable-cause requirement [does] not apply when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Id.* at 1727. "For example, at many intersections,

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

jaywalking is endemic but rarely results in arrest. If an individual who has been vocally complaining about police conduct is arrested for jaywalking at such an intersection," it is "insufficiently protective of First Amendment rights to dismiss the individual's retaliatory arrest claim on the ground that there was undoubted probable cause for the arrest." *Id.*

The no-probable-cause requirement also does not apply when the retaliatory arrest is part of an "official policy" of governmental intimidation. *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945, 1954 (2018). As the Supreme Court explained in *Lozman*:

> An official retaliatory policy is a particularly troubling and potent form of retaliation, for a policy can be long term and pervasive, unlike an ad hoc, on-the-spot decision by an individual officer. An official policy also can be difficult to dislodge. A citizen who suffers retaliation by an individual officer can seek to have the officer disciplined or removed from service, but there may be little practical recourse when the government itself orchestrates the retaliation. For these reasons, when retaliation against protected speech is elevated to the level of official policy, there is a compelling need for adequate avenues of redress.

*Id.* at 1948.

Here, governmental intimidation appears to be the entire basis for the Defendants' actions, and their conduct is unlawful and in violation of the First Amendment limitations on them.

### b. Defendants' actions violate the Fourth Amendment.

In addition to violating First Amendment protections of free speech and assembly, Defendants' conduct appears to violate of the Fourth Amendment protection against unlawful seizure, through unreasonable concealment of the arresting officers' identity and the agency or authority they serve.

For purposes of the Fourth Amendment, a person is seized when, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry v. Ohio*, 392 U.S. 1, 19 n 16 (1968). *See also Michigan v. Chesternut*, 486 U.S. 567, 573 (1988). The Declaration of

Page 14 -  MOTION FOR TEMPORARY RESTRAINING ORDER

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Pettibone describes being detained by armed men using physical force —a situation where a reasonable person would believe they were "not free to leave."  In other words, there can be little doubt it was a seizure pursuant to the Fourth Amendment.

To be Constitutional, an arrest must be supported by probable cause.  Probable cause under the Fourth Amendment is an objective standard. As explained in *Ornelas v. United States*, 517 U.S. 690, 696 (1996), probable cause exists "where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found[.]" *See also Devenpeck v. Alford*, 543 U.S. 146 (2004).  It is a "practical, common sense" determination based upon the "totality of the circumstances." *Illinois v. Gates*, 462 US 213, 238 (1983).  Probable cause for an arrest requires a fair probability that an offense has been committed or is being committed by the person who is to be arrested.  *See Beck v. Ohio*, 379 U.S. 89, 91 (1964); *Brinegar v. United States*, 338 U.S. 160 (1949).  There is no known, credible explanation for the Federal officers' arrest of Mr. Pettibone in this instance.  The fact that he was later released without any additional exchange of information, without any paper trail of what had happened to him, and without any understanding of who exactly had grabbed him off the street or what agency they worked for strongly suggests that probable cause never existed.

A person who is likely to be subject to unconstitutional search and seizure, including specifically being stopped by law enforcement without probable cause, has grounds to enjoin such conduct by law enforcement. *See Melendres v. Arpaio*, 695 F.3d 990, 999 (9th Cir. 2012) ("the threatened constitutional injury was likely to occur again, and thus, there was no error in the determination that the Plaintiffs had standing to pursue equitable relief as to their Fourth Amendment claims"). Of course, individuals cannot seek redress against an abuse of law enforcement authority, if the law enforcement officers never tell the individual who they are or who they work for, or why they picked that person up.

Mr. Pettibone's treatment does not stand alone, given the video evidence of other detentions.  When there is a persistent pattern of police misconduct, injunctive relief is

SP3/db5/#10342023-v1

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

appropriate. In *Hague v. Comm. for Indus. Org.*, 307 U.S. 496 (1939), the Supreme Court affirmed such relief when law enforcement officials restricted labor union activities, interfering with the distribution of pamphlets, preventing public meetings, and running some labor organizers out of town. The Court upheld an injunction that prohibited the police from "exercising personal restraint over (the plaintiffs) without warrant or confining them without lawful arrest and production of them for prompt judicial hearing . . . or interfering with their free access to the streets, parks, or public places of the city." *Id.* at 517.

The reasonableness—and constitutionality—of a seizure may also turn on whether the officer properly identified himself or herself as an officer to the arrestee during the encounter. The heavily armed men detaining Mr. Pettibone never advised under what authority he was being arrested, or by whom. The Seventh Circuit recently stated that "[i]n all but the most unusual circumstances, where identification would itself make the situation more dangerous, plainclothes officers must identify themselves when they initiate a stop." *Doornbos v. City of Chicago*, 868 F.3d 572, 575 (7th Cir. 2017). As the court explained:

> The tactic provokes panic and hostility from confused civilians who have no way of knowing that the stranger who seeks to detain them is an officer. This creates needless risks. Suppose you are walking along a street and are grabbed by a stranger (or three strangers). A fight-or-flight reaction is both understandable and foreseeable. Self-defense is a basic right, and many civilians who would peaceably comply with a police officer's order will understandably be ready to resist or flee when accosted—let alone grabbed—by an unidentified person who is not in a police officer's uniform. Absent unusual and dangerous circumstances, this tactic is unlikely to be reasonable when conducting a stop or a frisk.

Id. at 584-85 (quotation marks and citations omitted). *See also, e.g., Johnson v. Grob*, 928 F. Supp. 889, 905 (W.D. Mo. 1996) ("a seizure outside the home may be unreasonable because the officers involved were not identified or identifiable as such, and the seized person suffers injuries because of the officers' lack of identification."); *Newell v. City of Salina*, 276 F. Supp. 2d 1148, 1155 (D. Kan. 2003) (holding that a seizure, "without having identified themselves as law enforcement officers, may not be objectively reasonable.").

SP3/db5/#10342023-v1

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

The Ninth Circuit has reached a similar conclusion in evaluating a use of force situation. In *S.R. Nehad v. Browder*, 929 F.3d 1125, 1138 (9th Cir. 2019), the Ninth Circuit stated "we have also considered as relevant a police officer's failure to identify himself or herself as such . . . . Browder never verbally identified himself as a police officer or activated his police lights or siren. A jury could consider those failures in assessing Nehad's response to Browder and in determining whether Browder's use of force was reasonable."

Finally, this District has also concluded that a failure of police officers to identify themselves can amount to unlawful seizure. In *Child v. City of Portland*, 547 F. Supp. 2d 1161, 1165 (D. Or. 2008), the court considered a case in which Portland police failed to identify themselves before detaining a plaintiff, and concluded that that conduct amounted to a viable claim for illegal seizure that withstood summary judgment:

> The facts in this case, taken together, do not justify the intrusive nature of Defendant Officers' actions at the time of the seizure of Plaintiff. When the Defendant Officers initially saw Plaintiff riding her bicycle without a light, as required by law, they reasonably approached her for purposes of investigation. At this point, however, the officers departed from a course of behavior that permitted them to reasonably detain Plaintiff. First, they pulled up to Plaintiff in an unmarked car, failed to identify themselves as police officers, ignored Plaintiff's requests that they identify themselves, did not use the car lights in a manner that would suggest they were police officers, or otherwise attempt to communicate their purpose in approaching Plaintiff. Under these facts, Plaintiff was reasonably unsure and fearful of their intentions. Defendant Officers did not act reasonably when they chased a frightened woman into her yard and pulled her out of her house by her arm and her hair. Therefore, a reasonable jury could find for Plaintiff and Defendants' motion for summary judgment on the claim of illegal seizure should be denied.

As in the *Child* case, Defendants here are using unmarked vehicles, are not wearing a recognizable police uniform, are not identifying themselves or their agency, and are dragging frightened people into their cars. When these federal officers operate incognito, they cannot be distinguished from lawless militia opposed to the protests, or simply kidnappers out to exploit victims who may believe that they have an obligation to obey their captors. For the safety of everyone, the federal agents on the scene must identify themselves before making an arrest.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

The actions of Defendants in Oregon constitute a direct threat to the individual rights of all Oregonians. Allowing federal agents to roam the streets of an Oregon city detaining individuals in violation of their federal and State constitutional rights harms not just the individuals, but the interests of the State in protecting the constitutional rights of Oregonians. The Attorney General is likely to prevail on her claim for a declaration and injunction that seeks to hold federal officers to basic jurisdictional and constitutional standards.

### 3.    Irreparable harm.

Deprivation of a constitutional right is a harm in and of itself. *See, e.g., Padilla v. U.S. Immig. And Customs Enforcement*, 387 F. Supp. 3d 1219, 1231 (2019) citing *Hernandez v. Sessions*, 872 F. 3d 976, 995 (9th Cir. 2017). The conduct of federal agents chills the exercise of protected First Amendment rights and violates the law governing officers' conduct in light of Fourth Amendment rights. The law strongly favors the Attorney General's goal of preserving the peace of the State and protecting its people from arbitrary and unconstitutional detention.

If the conduct of the past week continues, the people of Oregon and the peace of the State will be irreparably harmed because people walking downtown will fear arbitrary and violent confrontations with persons who may—or may not—be federal officers.  And state and local law enforcement officers will be irreparably harmed because the Defendants' unconstitutional tactics will escalate confrontations with law enforcement, and undermine faith in law enforcement.

### 4.    The balance of equities supports issuing an injunction.

Balancing the equities requires the court to identify and consider "competing claims of injury" and how granting or denying the requested restraint will affect the parties.  *Winter*, *supra*, 555 U.S. at 24.  Because the Attorney General's request seeks maintenance of the lawful bounds of conduct applicable to the federal officers, no injury to defendants' interest is readily apparent. The balance of equities tips in favor of the Attorney General's commitment to protecting the people of the State and the public order.  *See W. Watersheds Project v. Bernhardt*, 391 F. Supp. 3d 1002, 1026 (D. Or. 2019) ("Courts also have repeatedly held that when the government does

Page 18 -  MOTION FOR TEMPORARY RESTRAINING ORDER

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

not properly follow the law or regulations, balancing the equities favors the plaintiff. *See,*
*e.g., Valle del Sol, Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) ("[i]t is clear that it
would not be equitable or in the public's interest to allow the state ... to violate the requirements
of federal law, especially when there are no adequate remedies available") (quoting *United States*
*v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011), aff'd in part, rev'd in part, and remanded
by *Arizona v. United States*, 567 U.S. 387 (2012) ); *J.L. v. Cissna*, 341 F. Supp. 3d 1048, 1070
(N.D. Cal. 2018) (noting that the balance of equities factor weighs in favor of the plaintiffs
'when plaintiffs have also established that the government's policy violates federal law').").

 Defendants have no legitimate claim to continue the conduct sought to be restrained.  No
public benefit accrues to permitting federal officers to circumvent the Constitution and cause fear
and confusion among the people of Oregon.

**5. The public interest supports restraining Defendants' conduct.**

 The public interest inquiry focuses primarily on the impact a restraint will have on non-
parties.  *See League of Wilderness Def./Blue Mountains Biodiversity Project v. Connaughton*,
752 F.3d 755, 766 (9th Cir. 2014); *Western Watersheds, supra*.  As Judge Simon recently noted,
"[w]hen the alleged action by the government violates federal law, the public interest factor
weighs in favor of the plaintiff."  *Western Watersheds*, *supra* (citing *Valle del Sol*, 732 F.3d at
1029.

 The *Don't Shoot Portland* decision recognized the complementary principle that "it is
always in the public interest to prevent the violation of a party's constitutional rights."  Order at
9, *Don't Shoot Portland*, June 6, 2020, *supra*.  This Court went on to explain, in the context of
the same public protests in Portland: "This is a significant moment in time.  The public has an
enormous interest in the rights of peaceful protesters to assemble and express themselves.  These
rights are critical to our democracy." *Id.* Additionally, as this Court concluded, the public interest
is also served by "allowing the police to do their jobs and to protect lives as well as property."
*Id*.  Here, the requested restraint serves the public interest in both ways.  Prohibiting federal

officers from engaging in the conduct at issue advances the public interest in allowing local authorities to pursue public peace without the incitements engendered by these unlawful acts.

There is no public interest in prior restraints of First Amendment rights, unconstitutional detentions, or arrests without probable cause. There will be a direct impact on people who may be subjected to the same conduct not knowing whether they are being abducted (and may resist with all their might, engaging in self-defense to the fullest extent permitted by law) or are being arrested (such that resisting may be charged as a crime).

### III.    CONCLUSION

Until the Court can convene a hearing on the Attorney General's request for a preliminary injunction, Defendants should be restrained from engaging in conduct that threatens to irreparably harm the public peace and security of Oregon.

DATED July   20  , 2020.

Respectfully submitted,
ELLEN F. ROSENBLUM
Attorney General

*s/ Sheila H. Potter*
SHEILA H. POTTER #993485
Deputy Chief Trial Counsel
STEVEN M. LIPPOLD, OSB #903239
Chief Trial Counsel
Trial Attorneys
Sheila.Potter@doj.state.or.us
Steve.Lippold@doj.state.or.us
Of Attorneys for Plaintiff

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000