ETHAN P. DAVIS
Acting Assistant Attorney General
BILLY J. WILLIAMS
United States Attorney
DAVID M. MORRELL
Deputy Assistant Attorney General
ALEXANDER K. HAAS
Director, Federal Programs Branch
BRAD P. ROSENBERG
Assistant Director, Federal Programs Branch
ANDREW I. WARDEN (IN #23840-49)
Senior Trial Counsel
JEFFREY A. HALL
JORDAN L. VON BOKERN
KERI BERMAN
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20530
Tel.:    (202) 616-5084
Fax:    (202) 616-8470

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| ELLEN ROSENBLUM, Oregon Attorney General, | Case No. 3:20-cv-01161-MO |
| Plaintiff. | **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRATINING ORDER AND PRELIMINARY INJUNCTION** |
| v. | |
| JOHN DOES 1-10, *et al.*, | |
| Defendants. | |

FEDERAL DEFENDANTS' OPPOSITION TO TRO & PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ........................................................................................................... 2

I.    Recent Destruction of Federal Property and Assaults on Federal Officers in
      Portland .................................................................................................................. 2

II.   Legal Authority to Protect Federal Property ....................................................... 5

STANDARD FOR EMERGENCY RELIEF .............................................................. 8

ARGUMENT .................................................................................................................. 9

I.    Plaintiffs is Unlikely to Succeed on the Merits .................................................. 9

      A.    Plaintiff Lacks Standing as Parens Patriae ............................................ 9

      B.    Plaintiff Plaintiff Fails to Demonstrate that Oregonians Have Suffered
            Even Past Harm ....................................................................................... 14

            1.    The Conclusory Allegations Fail to Establish that Any Seizures Have
                  Been Unreasonable Under the Fourth Amendment. ..............................14

            2.    Plaintiff Fails to Establish that Defendants Have Interfered with
                  Oregonians First Amendment Rights ........................................................16

      C.    Plaintiff Has Not Demonstrated Standing for Equitable Relief
            Based on Future Harm Harm .................................................................... 19

      D.    The Injunction Plaintiff Seeks is Overbroad and Unworkable ..............................22

II.   Plaintiff Cannot Demonstrate Irreparable Harm ................................................24

IV.   Both the Balance of the Equities and Public Interst Weigh Against Granting an
      Injunction..................................................................................................................25

CONCLUSION..............................................................................................................27

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Alaska v. United States, No. 91-36297*,
    1992 U.S. App. LEXIS 33377 (9th Cir. Dec. 7, 1992) .......................................................... 10

*All. for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011) ................................................................................................. 8

*Aziz v. Trump*,
    231 F. Supp. 3d 23 (E.D. Va. 2017) ....................................................................................... 10

*Bell v. Keating*,
    697 F.3d 445 (7th Cir. 2012) ................................................................................................. 26

*Blum v. Yaretsky*,
    457 U.S. 991 (1982) ............................................................................................................... 19

*Burton v. City of Belle Glade*,
    178 F.3d 1175 (11th Cir. 1999) ............................................................................................. 22

*Califano v. Yamasaki*,
    442 U.S. 682 (1979) ............................................................................................................... 22

*California v. Azar*,
    911 F.3d 558 (9th Cir. 2018) ................................................................................................... 9

*Center for Biological Diversity v. U.S. Dep't of the Interior*,
    563 F.3d 466 (D.C. Cir. 2009) .............................................................................................. 10

*Child v. City of Portland*,
    547 F. Supp. 2d 1161 (D. Or. 2008) ..................................................................................... 15

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983) ............................................................................................... 1, 2, 12, 19, 20

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ............................................................................................................... 21

*Curtis v. City of New Haven*,
    726 F.2d 65 (2d Cir. 1984) .................................................................................................... 20

*Cuviello v. City of Oakland*,
    2009 WL 734676 (N.D. Cal. Mar. 19, 2009) ........................................................................ 22

*Doornbos v. City of Chicago*,
    868 F.3d 572 (7th Cir. 2017) ........................................................................................... 15, 23

*E. Bay Sanctuary Covenant v. Barr*,
    934 F.3d 1026 (9th Cir. 2019) ............................................................................................... 22

*Eggar v. City of Livingston*,
    40 F.3d 312 (9th Cir. 1994) .................................................................. 20

*Feiner v. New York*,
    340 U.S. 315 (1951) .......................................................................... 25

*Garcia v. Google, Inc.*,
    786 F.3d 733 (9th Cir. 2015) ................................................................. 9

*Gill v. Whitford*,
    138 S. Ct. 1916 (2018) ....................................................................... 22

*Graham v. Connor*,
    490 U.S. 386 (1989) ................................................................... 6, 7, 21

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) ..................................................................... 17, 25-26

*Hague v. Comm. for Indus. Org.*,
    307 U.S. 496 (1939) .......................................................................... 23

*Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt Cty.*,
    542 U.S. 177 (2004) .......................................................................... 23

*Int'l Soc. for Krishna Consciousness, Inc. v. Lee*,
    505 U.S. 672 (1992) .......................................................................... 25

*Johnson v. Grob*,
    928 F. Supp. 889 (W.D. Mo. 1996) ......................................................... 15

*Lamb-Weston, Inc. v. McCain Foods, Ltd.*,
    941 F.2d 970 (9th Cir.1991) .................................................................. 22

*Lopez v. Brewer*,
    680 F.3d 1068 (9th Cir. 2012) ................................................................. 8

*Lozman v. City of Riviera Beach*,
    138 S. Ct. 1945 (2018) ....................................................................... 18

*Lujan v. Defenders of Wildlife*,
    504 U.S. 562 (1992) ................................................................. 11, 12, 19

*Massachusetts v. EPA*,
    549 U.S. 497 (2007) .......................................................................... 10

*McCollum v. Cal. Dep't of Corr. & Rehab.*,
    647 F.3d 870 (9th Cir. 2011) ............................................................. 11, 12

*Mendocino Envtl. Ctr. v. Mendocino Cty.*,
   192 F.3d 1283 (9th Cir. 1999) ...................................................... 17, 18

*Missouri ex rel. Koster v. Harris*,
   847 F.3d 646 (9th Cir. 2017) ................................................... 11, 13, 14

*Munns v. Kerry*,
   782 F.3d 402 (9th Cir. 2015) ............................................................ 21

*Murphy v. Kenops*,
   99 F. Supp. 2d 1255–60 (D. Or. 1999) ............................................ 20

*Nelsen v. King County*,
   895 F.2d 1248 (9th Cir. 1990) .......................................................... 19

*Nevada v. Burford*,
   918 F.2d 854 (9th Cir. 1990) ............................................................ 10

*Newell v. City of Salina*,
   276 F. Supp. 2d 1148 (D. Kan. 2003) .............................................. 15

*Nieves v. Bartlett*,
   139 S. Ct. 1715 (2019) ..................................................................... 18

*Nken v. Holder*,
   556 U.S. 418 (2009) ......................................................................... 24

*NLRB v. USPS*,
   486 F.3d 683 (10th Cir. 2007) .......................................................... 22

*Alfred L. Snapp & Son v. P.R.*
   458 U.S. 592 (1982) ................................................................... 10, 13

*Washington Utils. and Transp. Comm'n v. FCC*,
   513 F.2d 1142 (9th Cir. 1975) .......................................................... 10

*Oregon v. Legal Servs. Corp.*,
   552 F.3d 965 (9th Cir. 2009) ............................................................ 13

*O'Shea v. Littleton*,
   414 U.S. 488 (1974) ......................................................................... 20

*Pac. Kidney & Hypertension, LLC v. Kassakian*,
   156 F. Supp. 3d 1219 (D. Or. 2016) .................................................. 8

*Rendish v. City of Tacoma*,
   123 F.3d 1216 (9th Cir. 1997) .......................................................... 24

*Ringgold-Lockhart v. Cty. of Los Angeles*,
   761 F.3d 1057 (9th Cir. 2014) .......................................................... 25

*Rizzo v. Goode*,
    423 U.S. 362 (1976) ............................................................... 20

*S.C. Johnson & Son, Inc. v. Clorox Co.*,
    241 F.3d 232 (2d Cir. 2001) ................................................ 22

*S.R. Nehad v. Browder*,
    929 F.3d 1125 (9th Cir. 2019) ............................................ 15

*Sierra Forest Legacy v. Sherman*,
    646 F.3d 1161 (9th Cir. 2011) ............................................ 10

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ............................................................... 9

*Texas v. U.S.*,
    86 F. Supp. 3d 591 (S.D. Tex. 2015) ................................. 10

*United States v. 100.00 in U.S. Currency*,
    354 F.3d 1110 (9th Cir. 2004) ......................................... 12-13

*United States v. Christopher*,
    700 F.2d 1253 (9th Cir. 1983) ............................................. 6

*United States v. Griefen*,
    200 F.3d 1256 (9th Cir. 2000) ................................... 17, 25, 26

*United States v. Hensley*,
    469 U.S. 221 (1985) ............................................................. 26

*United States v. Patane*,
    542 U.S. 630 (2004) ............................................................. 21

*United States v. Sharpe*,
    470 U.S. 675 (1985) ............................................................. 24

*Voigt v. Savell*,
    70 F.3d 1552 (9th Cir. 1995) ............................................. 11

*Williams v. Birmingham Bd. of Educ.*,
    904 F.3d 1248 (11th Cir. 2018) ..................................... 20-21

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ................................................................... 8

## Constitution

U.S. Const., amend. I ............................................................... passim

U.S. Const., amend. IV ........................................................... 1, 14

**Statutes**

18 U.S.C § 111 ............................................................................................... 5, 25

18 U.S.C. § 1361 .............................................................................................. 25

28 U.S.C. § 566 ............................................................................................. 7, 8

40 U.S.C. § 1315 ............................................................................................ 5, 6

**Regulations**

41 C.F.R. § 102-74.390 ...................................................................................... 6

28 C.F.R. § 0.111 .............................................................................................. 7

**Rules**

Fed. R. Civ. P. 65 ............................................................................................ 22

## INTRODUCTION

Plaintiffs seek the extraordinary remedy of a temporary restraining order and preliminary injunction that would hinder the ability of federal law enforcement officers to protect federal property that has been repeatedly damaged after weeks of violent protests in Portland.  Plaintiff, the Oregon Attorney General, bases this request for emergency injunctive relief on alleged violations of the First and Fourth Amendment rights of Oregon residents.  The Court should deny this request for several reasons.

First, Plaintiff lacks standing to seek emergency relief.  Although Plaintiff intends to act as *parens patriae* on behalf of Oregon residents, Oregon has no quasi-sovereign interests justifying Plaintiff acting in such a capacity.  Even if Plaintiff could assert third-party standing for such claims generally, there is no constitutional standing here, because it is well-established that a plaintiff lacks standing to obtain prospective injunctive relief for alleged future injuries based on allegations of prior harm.  *See City of Los Angeles v. Lyons,* 461 U.S. 95, 101 (1983).  Yet that is Plaintiff's gambit here—seeking to have the Court enter a temporary restraining order based on at most two alleged past encounters involving federal law enforcement officers, when Plaintiff has not demonstrated that similar incidents will take place in the future.  But Plaintiff has also failed to demonstrate that even those past encounters violated Oregonians' rights.  Plaintiff cannot therefore demonstrate a certainly impending injury, so there is no standing to seek injunctive relief.  For many of these same reasons, Plaintiff also cannot show a likelihood of irreparable harm, a prerequisite for granting emergency injunctive relief.

Second, the relief that Plaintiff seeks is entirely improper.  Plaintiff seeks a sweeping injunction that would be unworkable in light of the split-second judgments that federal law enforcement officers have to make while protecting federal property and themselves during dynamic, chaotic situations.  By eliminating lawful investigatory stops and requiring federal

DEFENDANTS' OPPOSITION TO TRO & PRELIMINARY INJUNCTION – 1

officers to go far beyond the requirements of law in identifying themselves and explaining the rationale for each of their actions, all under the threat of contempt, the proposed injunction would improperly bind the hands of law enforcement.  It would prevent them from taking appropriate action when individuals are engaging in criminal conduct and be unworkable from a practical standpoint as law enforcement officers respond to violent situations.

Third, and finally, the balance of the equities and the public interest counsel against granting Plaintiff's request.  The public has a strong interest in the maintenance of public safety, including protecting federal property and protecting law enforcement officers and the general public against imminent threats of serious bodily injury.  Simply put, the federal government has the legal obligation and right to protect federal property and federal officers, and the public has a compelling interest in the protection of that property and personnel.  Federal officers must be free to investigate violations of the federal law and arrest those engaging in violent crimes in a manner consistent with the Constitution.

## **BACKGROUND**

### I.     **Recent Destruction of Federal Property and Assaults on Federal Officers in Portland**

For nearly two months, Portland has witnessed daily protests in its downtown area.  *See* Declaration of Gabriel Russell ¶ 3, Federal Protective Service (FPS) Regional Director, (attached as Exhibit 1).  These daily protests have regularly been followed by nightly criminal activity in the form of vandalism, destruction of property, looting, arson, and assault.  *See id.*

Federal buildings and property have been the targets of many of these attacks, including the Mark O. Hatfield Federal Courthouse, the Pioneer Federal Courthouse, the Gus Solomon Federal Courthouse, the U.S. Immigration and Customs Enforcement (ICE) Building, and the Edith Green Wendall Wyatt Federal Office Building.  *See* Russell Decl. ¶ 4.  For example, on

May 28, 2020, the ICE Portland Field Office was targeted by a Molotov Cocktail.  *See* Affidavit

of Special Agent David Miller ¶ 5 (July 4, 2020), *United States v. Olsen*, 20-mj-00147 (D. Or)

(Exhibit 2).  The Mark O. Hatfield Courthouse has experienced significant damage to its façade

and building fixtures, including the vandalism and theft of building security cameras and access

control devices.  *Id.*  The most recent repair estimate for the damage at the Hatfield Courthouse

is in excess of $50,000.  *Id.*

Officers protecting these properties have also been subject to threats, rocks and ball

bearings fired with wrist rockets, improvised explosives, aerial fireworks, commercial grade

mortars, high intensity lasers targeting officers' eyes, full and empty glass bottles, and balloons

filled with paint and other substances such as feces.  Russell Decl. ¶ 4.  The most serious injury

to an officer to date occurred when a protester wielding a two-pound sledgehammer struck an

officer in the head and shoulder when the officer tried to prevent the protester from breaking

down a door to the Hatfield Courthouse.  *Id.*  To date, 28 federal law enforcement officers have

experienced injuries during the rioting.  Injuries include broken bones, hearing damage, eye

damage, a dislocated shoulder, sprains, strains, and contusions.  *Id.; see* Acting Secretary Wolf

Condemns The Rampant Long-Lasting Violence in Portland (July 16, 2020) (Exhibit 3) (listing

over 75 separate incidents of property destruction and assaults against federal officers between

May 29, 2020 and July 15, 2020); *see also* DHS, FPS, and CBP Press Conference July 21, 2020,

*available at* https://www.youtube.com/watch?v=2XTYITCtFlc (last visited July 22, 2020).

In response to the damage to federal property and assaults on federal law enforcement

officers, DHS deployed federal officers to Portland for the purposes of protecting federal

buildings and property.  Russell Decl. ¶ 5.  There are currently 114 federal law enforcement

officers from the FPS, ICE, U.S. Customs and Border Protection (CBP), and the US Marshals

Service (USMS) protecting federal facilities in downtown Portland.  *Id.*  From May 27 until July 3, officers were stationed in a defensive posture intended to de-escalate tensions by remaining inside federal buildings and only responding to breach attempts or other serious crimes.  *Id.*  This attempt to de-escalate was unsuccessful and an increasingly violent series of attacks culminated in a brazen effort to break into and set fire to the Hatfield Courthouse in the early morning hours of July 3, 2020.  *Id.*  A group of individuals used teamwork and rehearsed tactics to breach the front entry of the Courthouse by smashing the glass entryway doors.  *Id.*  The individuals threw balloons containing an accelerant liquid into the lobby and fired powerful commercial fireworks towards the accelerant in an apparent attempt to start a fire.  *Id.*

The violence against federal officers and federal property over the Fourth of July holiday weekend resulted in the arrests of multiple individuals:

- On July 2-3, 2020, Rowan Olsen used his body to push on and hold a glass door at the Hatfield Courthouse closed, preventing officers from exiting the building and causing the door to shatter.  With the door broken, a mortar firework entered the courthouse, detonating near the officers.  The officers used shields and their bodies to block the open doorway for approximately six hours until demonstrators dispersed.

- On July 4, 2020, Shat Singh Ahuja willfully destroyed a closed-circuit video camera mounted on the exterior of the Hatfield Courthouse.

- On July 5, 2020, Gretchen Blank assaulted a federal officer with a shield while the officer was attempting to arrest another protester.

- On July 5-6, 2020, four men assaulted federal officers with high intensity lasers.  At the time of his arrest, one of the men also possessed a sheathed machete.

*See* Seven Arrested, Facing Federal Charges After Weekend Riots at Hatfield Federal Courthouse (July 7, 2020) (Exhibit 4).  In response to the increasingly violent attacks, DHS implemented tactics intended to positively identify and arrest serious offenders for crimes such as assault, while protecting the rights of individuals engaged in protected free speech activity. Russell Decl. ¶ 5.

DEFENDANTS' OPPOSITION TO TRO & PRELIMINARY INJUNCTION – 4

## II.    Legal Authority to Protect Federal Property

FPS, a component of the Department of Homeland Security, is the federal agency

charged with protecting federal facilities across the country.  *See* Federal Protective Service

Operation, at https://www.dhs.gov/fps-operations.  Congress authorized DHS to "protect the

buildings, grounds, and property that are owned, occupied, or secured by the Federal

Government."  40 U.S.C. § 1315(a).  While engaged in their duties, FPS officers are authorized

to conduct a wide range of law enforcement functions:

> (A) enforce Federal laws and regulations for the protection of persons and  property;
>
> (B) carry firearms;
>
> (C) make arrests without a warrant for any offense against the United States committed in the presence of the officer or agent or for any felony cognizable under the laws of the United States if the officer or agent has reasonable grounds to believe that the person to be arrested has committed or is committing a felony;[1]
>
> (D) serve warrants and subpoenas issued under the authority of the United States;
>
> (E) conduct investigations, on and off the property in question, of offenses that may have been committed against property owned or occupied by the Federal Government or persons on the property; and
>
> (F) carry out such other activities for the promotion of homeland security as the Secretary may prescribe.

40 U.S.C. § 1315(b)(2).

Additionally, the Secretary of Homeland Security may designate DHS employees "as

officers and agents for duty in connection with the protection of property owned or occupied by

the Federal Government and persons on the property, including duty in areas outside the property

to the extent necessary to protect the property and persons on the property."  40 U.S.C.

§ 1315(b)(1).

---

[1] *See, e.g.*, 18 U.S.C § 111 (assaulting a federal officer).

DEFENDANTS' OPPOSITION TO TRO & PRELIMINARY INJUNCTION – 5

Congress also delegated authority to DHS to issue regulations "necessary for the protection and administration of property owned or occupied by the Federal Government and persons on the property."  40 U.S.C. § 1315(c).  Current regulations may include "reasonable penalties," including fines and imprisonment for not more than 30 days.  40 U.S.C. § 1315(c)(2). The regulations cover many activities, including prohibiting disorderly conduct on federal property (41 C.F.R. § 102-74.390); failing to obey a lawful order (41 C.F.R. § 102-74.385); and creating a hazard on federal property (41 C.F.R. § 102-74.380(d)).  *See United States v. Christopher*, 700 F.2d 1253 (9th Cir. 1983) (affirming convictions on charges of being present on federal property after normal work hours in violation of 41 C.F.R. §§ 101–20.302 and 101– 20.315).

In exercising its authority to protect federal property, FPS follows DHS policy on the use of force.  *See* DHS Policy on the Use of Force (Sept. 7, 2018) (Exhibit 5).  Consistent with guidance from the Supreme Court, *see Graham v. Connor*, 490 U.S. 386 (1989), DHS policy authorizes officers to "use only the force that is objectively reasonable in light of the facts and circumstances confronting him or her at the time force is applied," recognizing that officers are "often forced to make split-second judgments, in circumstances that are tense, uncertain, and rapidly evolving."  DHS Policy at 1–2.  The policy states that officers "should seek to employ tactics and techniques that effectively bring an incident under control while promoting the safety of [the officer] and the public, and that minimize the risk of unintended injury or serious property damage."  *Id.* at 3.  DHS components must conduct training on "less-lethal use of force" at least every two years and incorporate decision-making and scenario-based situations.  *Id.* at 5. Further, officers must demonstrate proficiency with less-lethal force devices, such as impact

weapons or chemical agents, before using such devices.  *Id.*  DHS policy emphasizes "respect for human life," "de-escalation," and "use of safe tactics."  *Id.* at. 3.

DHS has also emphasized to its employees the importance of respecting activities protected by the First Amendment.  *See* DHS Memo re: Information Regarding First Amendment Protected Activities (May 17, 2029) (Exhibit 6).  "DHS does not profile, target, or discriminate against any individual for exercising his or her First Amendment rights."  *Id.* at 1.

In addition to DHS's authority to protect federal property, the United States Marshals Service, a component of the Department of Justice, provides security inside federal courthouses in each of the 94 federal judicial districts and in the District of Columbia Superior Court.  *See* U.S. Marshals Service, Court Security, at www.usmarshals.gov/duties/courts.htm/.  The Marshals Service protects judges and other court officials at over 400 locations where court-related activities are conducted.  *Id.*  As set forth in 28 U.S.C. § 566(a), "[i]t is the primary role and mission of the United States Marshals Service to provide for the security and to obey, execute, and enforce all orders of the United States District Courts, the United States Courts of Appeals, the Court of International Trade, and the United States Tax Court, as provided by law." The regulations governing the duties of the Marshals Service further authorize it to provide "assistance in the protection of Federal property and buildings."  28 C.F.R. § 0.111(f); *see also* 28 U.S.C. § 566(i) (requiring the Director of the United States Marshals Service to consult with the Judicial Conference of the United States concerning, *inter alia*, "the security of buildings housing the judiciary" and stating that the "United States Marshals Service retains final authority regarding security requirements for the judicial branch of the Federal Government.").

The Marshals Service's actions to protect the federal judiciary are guided by an agency-wide use of force policy.  *See* United States Marshals Service, Policy Directive 14.15, Use of

Force (Sept. 24, 2018) (Exhibit 7).  Pursuant to that policy, the use of force must be objectively reasonable and Deputy Marshals may use less-than-lethal force only in situations where reasonable force, based upon the totality of the circumstances at the time of the incident, is necessary to, among other things, protect themselves or others from physical harm or make an arrest.  *See id.*  Deputy Marshals are not authorized to use less-than-lethal devices if voice commands or physical control achieve the law enforcement objective.  *See id.*  Further, they must stop using less-than-lethal devices once they are no longer needed to achieve its law enforcement purpose.  *See id.*  And in all events, less-than-lethal weapons may not be used to punish, harass, taunt, or abuse a subject.  *See id.*

## STANDARD FOR EMERGENCY RELIEF

The standard for a temporary restraining order is generally the same as for a preliminary injunction.  *Pac. Kidney & Hypertension, LLC v. Kassakian*, 156 F. Supp. 3d 1219, 1222 (D. Or. 2016).  A preliminary injunction is "an extraordinary and drastic remedy" that should not be granted "unless the movant, by a clear showing, carries the burden of persuasion."  *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012).  A plaintiff must show that (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest.  *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008).[2]  "Likelihood of success on the merits is the most important factor" and if a plaintiff fails to meet this "threshold inquiry," the

---

[2] Alternatively, "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest."  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (citation omitted).

court "need not consider the other factors." *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018). Because standing is a prerequisite to the Court's exercise of jurisdiction, *see Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014), the plaintiff's claims on the merits have no likelihood of success if the plaintiffs cannot establish standing. *Id.* at 158 ("The party invoking federal jurisdiction bears the burden of establishing' standing and must do so "the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation.") (internal quotations and citations omitted).

Plaintiff must meet an even higher standard in this case because they seek a mandatory injunction that would alter the status quo and impose affirmative requirements on law enforcement officers as they carry out their duties. *See Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (mandatory injunctions are "particularly disfavored" and the "district court should deny such relief unless the facts and law clearly favor the moving party.") (internal quotations omitted). As explained below, Plaintiff cannot meet this demanding standard.

## ARGUMENT

### I.     PLAINTIFF IS UNLIKELY TO SUCCEED ON THE MERITS

#### A.     Plaintiff Lacks Standing as *Parens Patriae*

The sole Plaintiff in this matter is the State of Oregon through the Attorney General in her official capacity. Plaintiff alleges standing on a *parens patriae* theory, Pl. Mot. at 9-10, which is not supported by the allegations of the complaint or the arguments of Plaintiffs' motion for a temporary restraining order. Because standing is a prerequisite to the Court's exercise of jurisdiction, *see Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014), Plaintiff's claims have no likelihood of success on the merits. *Id.* at 159.

Plaintiff relies on *Alfred L. Snapp & Son v. P.R.*, 458 U.S. 592 (1982) ("*Snapp*"), and two out-of-Circuit district court cases, *Aziz v. Trump*, 231 F. Supp. 3d 23, 30 (E.D. Va. 2017), and *Texas v. U.S.*, 86 F. Supp. 3d 591, 626 (S.D. Tex. 2015), for the proposition that a state may bring suit *parens patriae* against the federal government. However, *Snapp*, and the controlling law of this Circuit, hold exactly the opposite: "[A] State does not have standing as *parens patriae* to bring an action against the Federal Government." [3] *Nevada v. Burford*, 918 F.2d 854, 858 (9th Cir. 1990) (quoting *Snapp*, 458 U.S. 592, 610 n.10); *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1178 (9th Cir. 2011) ("California, like all states, does not have standing as *parens patriae* to bring an action against the Federal Government." (citation omitted)). This alone dooms Plaintiff's assertion of *parens patriae* standing here.

But even if *Nevada* were not fatal to Plaintiff's *parens patriae* standing, Plaintiff would still be unable to establish standing under that theory or even under a more general theory of third-party standing. "States asserting *parens patriae* standing must meet both the basic requirements of Article III standing and the unique requirements of that doctrine," namely that

---

[3] Moreover, both the *Aziz* and *Texas* cases rely in part on *Washington Utils. and Transp. Comm'n v. FCC*, 513 F.2d 1142 (9th Cir. 1975), a Ninth Circuit decision which predates *Snapp* and which the Circuit has recognized is no longer good law on this question. *See Alaska v. United States*, No. 91-36297, 1992 U.S. App. LEXIS 33377, at *3 (9th Cir. Dec. 7, 1992) ("Though at one time we recognized *parens patriae* standing [in suits against federal agencies], *see Washington Utils. & Transp. Comm'n v. FCC*, 513 F.2d 1142, 1153 (9th Cir. 1975) . . . we have since acknowledged that the view expressed by the Supreme Court in *Snapp* is controlling.") (citing *Nevada*, 918 F.2d at 858.) Plaintiff does not invoke *Massachusetts v. EPA*, 549 U.S. 497 (2007), but that case also does not undermine *Nevada*. The Supreme Court did not invoke Massachusetts's *parens patriae* interests—*i.e.*, its interests in protecting its citizens' well-being. Rather, the Court relied on Massachusetts's own interests in protecting its sovereign territory. 549 U.S. at 522 ("rising seas ha[d] already begun to swallow Massachusetts' coastal land"); *see also Center for Biological Diversity v. U.S. Dep't of the Interior*, 563 F.3d 466, 476 (D.C. Cir. 2009) (observing that in *Massachusetts v. EPA*, Massachusetts was suing in its own interest as a sovereign).

the State articulates an interest apart from the interests of particular private parties and that the

State "express[es] a quasi-sovereign interest." *Missouri ex rel. Koster v. Harris*, 847 F.3d 646,

651 (9th Cir. 2017) (internal citations omitted).[4] Plaintiff can meet neither the general

requirements of constitutional standing nor the additional requirements of a *parens patriae*

theory.

On constitutional standing, Plaintiff has not and could not allege that Oregon is itself

subject to any unlawful detentions or any deprivation of constitutional rights. *See* Compl. 5-7. As

a result, Plaintiff could only hope to establish Article III standing under the third-party standing

doctrine.  But because "plaintiff is not the object of the government action…challenge[d],

standing…[is] substantially more difficult' to establish." *Lujan v. Defenders of Wildlife*, 504 U.S.

562 (1992). "To demonstrate third party standing, a plaintiff must show his own injury, a close

relationship between himself and the parties whose rights he asserts, and the inability of the

parties to assert their own rights." *McCollum v. Cal. Dep't of Corr. & Rehab.*, 647 F.3d 870, 879

(9th Cir. 2011) (citing *Powers v. Ohio*, 499 U.S. 400, 410-11 (1991)). Assuming for purposes of

this motion only that an individual's presence within a state constitutes such a "close

relationship,"[5] Plaintiff still fails to satisfy the third-party standing requirements.

Plaintiff claims that Defendants' alleged conduct "violate[s] the state's sovereign

interests in enforcing its laws and in protecting people within its borders from kidnap and false

arrest." Compl. ¶ 20; Pl. Mot. at 8 ("harm to the State in its sovereign interests in maintaining

public safety and order"). Plaintiff also argues that "[t]he State itself is damaged by the

---

[4] Unlike this case, *Harris* was a suit by states against another state and private parties.
[5] What constitutes a sufficiently close relationship is not clearly defined and does not track well
with the situation presented in this case. *See Voigt v. Savell*, 70 F.3d 1552, 1564-65 (9th Cir.
1995) (collecting cases).

DEFENDANTS' OPPOSITION TO TRO & PRELIMINARY INJUNCTION – 11

Defendants' violence on its streets," and "damaged by the ease with which the tactics now being deployed by federal law enforcement can be mimicked creates an increased risk of horrific crimes being committed by private citizens who oppose the protests." Pl. Mot. at 9. No mention is given to the role the state should generally play in preventing the widespread violence, and the violence specifically targeting federal property in Portland, that has necessitated a federal response. Regardless, all of these allegations are purely speculative and cannot support the finding of injury-in-fact necessary to establish standing and obtain preliminary relief. For a plaintiff to have standing, an alleged injury must be "concrete" and "actual or imminent, not 'conjectural' or 'hypothetical.'" *Lyons*, 461 U.S. at 101–02. This "imminence requirement ensures that courts do not entertain suits based on speculative or hypothetical harms." *Lujan*, 504 U.S. at 564. Plaintiff has made no allegations, much less submitted any evidence, to support a finding of actual and imminent risks related to its baseless and imaginative claims about kidnapping.[6]

Second, even if Plaintiff could sufficiently allege an injury to the state itself, Plaintiff would still fail to establish Article III standing because she has neither alleged, nor is there any reason to believe, that individuals potentially subject to Defendants' alleged conduct are unable to assert their own rights. *See McCollum*, 647 F.3d at 879. Individuals who may allegedly be detained are the natural challengers of such detention and the parties that would be expected to assert any individual constitutional rights. Plaintiff has not alleged that any such individuals are under any disability preventing them from asserting their own rights. *See, e.g.*, *United States v.*

---

[6] Plaintiff also makes a passing claim that Defendants' alleged actions "could also impose post-event investigation and prosecution costs upon the State, which will divert its resources of staff and money from other tasks." Pl. Mot. at 11. However, this claim was neither alleged in Plaintiff's complaint nor is it consistent with Plaintiff's theory of *parens patriae* standing.

*100,348.00 in U.S. Currency*, 354 F.3d 1110, 1129 (9th Cir. 2004).[7] Thus, even if *parens patriae* were an otherwise viable theory, Plaintiff could not invoke it, since Plaintiff cannot establish the basic requirements of third-party standing.

In reality though, Plaintiff cannot satisfy any element of a *parens patriae* suit. First, Plaintiff cannot articulate an interest independent of the interests of individual private parties and is therefore no more than a nominal party. As explained *supra*, Plaintiff has not sufficiently alleged any harms to the state itself resulting from Defendants' alleged actions. Moreover, as the complaint makes clear, all of the causes of action, and in particular the relief requested, are directed at the interests of individual citizens and not at any independent interest of the state of Oregon. *See* Compl. at 6-9; *see also Snapp*, 458 U.S. at 602 ("Interests of private parties are obviously not in themselves sovereign interests, and they do not become such simply by virtue of the State's aiding in their achievement. In such situations, the State is no more than a nominal party."). "Courts have recognized that *parents patriae* standing is inappropriate where an aggrieved party could seek private relief…. Here, complete relief would be available to the [protestors] themselves, were they to file a complaint on their own behalf." *Harris*, 847 F.3d at 652.

Second, Plaintiff has not identified a sufficient quasi-sovereign interest. "Generally, a state has been granted standing under the *parens patriae* doctrine in situations involving the abatement of public nuisances, such as global warming, flooding, or noxious gases." *Oregon v. Legal Servs. Corp.*, 552 F.3d 965, 970 (9th Cir. 2009) (collecting cases). While "[t]here are no

---

[7] Indeed, three other lawsuits by interested non-governmental plaintiffs, *Index Newspapers, LLC v. City of Portland*, No. 3:20-cv-1035-SI (D. Or.); *Western States Center, Inc. v. U.S. Dep't of Homeland Security*, No. 3:20-cv-01175 (D. Or.); and *Paul v. Trump*, No. 3:20-cv-1188 (D. Or.), have been filed, and Defendants understand additional lawsuits may be filed raising similar claims.

definitive limits on the proportion of the population of the State that must be adversely affected,"
"more must be alleged than injury to an identifiable group of individual residents." *Harris*, 847
F.3d at 651 (citation omitted). A state must "allege[] injury to a sufficiently substantial segment
of its population." *Id.* No such large-scale problem requiring collective or government action is
alleged in this case, nor are there any allegations of actual or imminent physical harm to anything
approximating a "substantial segment of its population." *Id.* Although Plaintiff speaks in broad,
unqualified language about the people of the entire state of Oregon, the facts alleged make clear
that the Defendants are only undertaking their alleged activities in the immediate vicinity of the
Portland Federal buildings. Pl. Mot. at 2-4. Moreover, the law enforcement actions of which
Plaintiff complains have been employed typically only in early morning hours after the protests
have turned violent and in some cases after individuals have refused to comply with legally valid
orders to disperse and cease trespassing on federal property. *See* Russell Decl. ¶¶ 5-7. Indeed,
there are no allegations that the Defendants have interacted with any residents of Portland who
were not engaged in protests near the Federal buildings. Thus, Plaintiff's supposed quasi-
sovereign interest is in reality just the personal interest of an identifiable group of individual
residents. *See supra* fn. 7.

Plaintiffs have failed to establish standing under any of the theories potentially implicated
by their complaint and TRO and therefore their requested relief must be denied.

> ### B.    Plaintiff Fails to Demonstrate that Oregonians Have Suffered Even Past Harm
>
> #### 1.    The Conclusory Allegations Fail to Establish that Any Seizures Have Been Unreasonable Under the Fourth Amendment

Plaintiff argues that arrests may have violated the Fourth Amendment by citing an
alleged instance where an arresting federal officer did not "properly identif[y] himself or herself
as an officer to the arrestee during the encounter." Pl. Mot. at 16. The cases on which Plaintiff

relies, however, are inapposite because they concerned "plainclothes officers" and officers who were neither "identified or identifiable" as law enforcement officers. *Doornbos v. City of Chicago*, 868 F.3d 572, 584-85 (7th Cir. 2017); *Johnson v. Grob*, 928 F. Supp. 889, 894, 904-05 (W.D. Mo. 1996); *Newell v. City of Salina*, 276 F. Supp. 2d 1148, 1154-55 (D. Kan. 2003); *Child v. City of Portland*, 547 F. Supp. 2d 1161, 1165 (D. Or. 2008).[8] None of these cases concerned the kind of facts alleged here, where "Police" was written in bold letters on a uniform and was clearly seen by the individual. *Compare* Pl. Mot. at 16-17 *with* First Declaration of Mark Pettibone ¶ 3. The cases Plaintiff relies on also only assert that an officer should verbally identify himself as a police officer when, unlike here, the officers wore plainclothes or otherwise provided no notice of their identity as law enforcement. *See Doornbos*, 868 F.3d at 584-85 (plainclothes officers); *Newell*, 276 F. Supp. 2d at 1153 (officer approached from behind); *Child*, 547 F. Supp. 2d at 1165 (officers approached in an unmarked car in the dark).

Plaintiff asserts in conclusory terms that federal officers "are not wearing a recognizable police uniform." Pl. Mot. at 17. But that cannot be based on Mr. Pettibone's experience. As noted in his declaration, the federal officers arresting him wore "green military fatigues and adorned with generic 'police' patches." First Decl. of Mark Pettibone ¶ 6. Nor does the video on which Plaintiff relies support the allegation, since she states it shows "two men in camouflage military-style uniforms and 'POLICE' patches." Pl. Mot. at 4. As Plaintiff notes, CBP issued a statement indicating that those CBP officers also wore "CBP insignia," *id.* at 5; although she

---

[8] In an excessive force (police shooting) case Plaintiff cited, it was unclear whether the police officer was plainly apparent as police, and the parties did not raise the issue, but the court indicated that the lack of verbal identification or use of a police siren could be considered as a factor; the decedent was walking toward the police car while its high beam headlights were on, so it is not clear that he could see anything. *See S.R. Nehad v. Browder*, 929 F.3d 1125, 1130, 1138 (9th Cir. 2019).

DEFENDANTS' OPPOSITION TO TRO & PRELIMINARY INJUNCTION – 15

says those are not visible in the video, it is clear that the agents *do* have insignia, even if not visible due to the low resolution of the video.  Pl. Mot. at 5.  While Plaintiff may prefer more identification, she has not established that the identification federal officers unquestionably have been using was constitutionally deficient.

Plaintiff also asserts that there was no clear probable cause for two arrests.  The limited video clip that Plaintiff continues to rely on,[9] Pl. Mot. at 4, begins just as federal officers approach the individual, so it provides no context of what was occurring even immediately before federal officers approached the individual.  And, as Plaintiff notes, CBP issued a statement in connection with that video that "CBP agents had information indicating the person in the video was suspected of assaults against federal agents or destruction of federal property."  Pl. Mot. at 4.  Plaintiff offers nothing to contradict that.  With regard to Mr. Pettibone's arrest, Plaintiff argues that there "is no known, credible explanation for the Federal officers' arrest of Mr. Pettibone."  While his first declaration notes that he had been "peacefully taking part in a demonstration," Declaration of Mark Pettibone ¶ 2, neither of his declarations specifically disclaim that there would have been reasonable suspicion or probable cause, or state that he had not otherwise engaged in unlawful activity.

### 2.    Plaintiff Fails to Establish that Defendants Have Interfered with Oregonians First Amendment Rights

Plaintiff alleges that Defendants' general conduct has interfered with Oregonians exercise of their First Amendment rights by creating a general "climate of fear and intimidation."  Pl. Mot. at 11.  Again, Plaintiff relies on broad statements of law from cases that have no application to the facts alleged. Most notably, Plaintiff does not appear to allege that federal officers

---

[9] Although Plaintiff noted a second video, Pl. Mot. at 5, in a letter to the Court, Dkt. No. 12, Plaintiff withdrew reliance on that because it did not concern activities in Portland.

disrupted any in-progress protests. And even if that were the allegation, the violence directed at federal officers and federal property warranted appropriate measures to restore order. *See, e.g.*, *Grayned v. City of Rockford*, 408 U.S. 104, 116 (1972) ("[W]here demonstrations turn violent, they lose their protected quality as expression under the First Amendment"); *United States v. Griefen*, 200 F.3d 1256, 1260 (9th Cir. 2000) (upholding the relocation of protestors who "had already shown by their destructive conduct that they presented a clear and present danger to the safe completion of the construction project, both to other persons as well as to themselves"). Instead, Plaintiff focuses on alleged arrests made by federal officers and the manner in which they allegedly occurred as creating a chilling effect. Pl. Mot. at 11 (asserting the right to exercise First Amendment rights "without fear of unlawful detention by federal officers concealing their identity, silently grabbing them and shoving them into cars without explanation, seemingly without probable cause for arrests").

As Plaintiff's own cases suggest, however, there are several impediments to her theory that the manner of these alleged arrests violated First Amendment rights. First, a First Amendment retaliation claim requires a showing that deterrence was "a substantial or motivating factor" in the Defendant's conduct. *Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1300 (9th Cir. 1999). In other words, intent to inhibit speech is an element of the claim. To meet this burden, Plaintiff points to various "statements of federal officials," which she claims "mischaracteriz[ed] protests and other constitutionally protected assembly in Portland." Pl. Mot. at 13. Given the weeks of violent protests and damage directed against federal property and injuries sustained by federal officers, it unclear how exactly federal officials have mischaracterized the protests. But even if one credited her characterization of such statements, they hardly establish any improper motive behind the surge of federal law-enforcement in

Portland, much less an improper motive behind the cited encounters with law enforcement officers.

Second, a plaintiff may generally not base any retaliation claim on an arrest for which there was probable cause. *See Nieves v. Bartlett*, 139 S. Ct. 1715, 1727 (2019). But, as discussed above, Plaintiff has not demonstrated a lack of probable cause associated with the arrests alleged in the motion. And while there is an exception to the general rule "when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been," *id.*, she cites no such evidence here. Nor has she identified an "official retaliatory policy." *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945, 1954 (2018). To identify such a policy, Plaintiff would have to "prove the existence and enforcement of an official policy motivated by retaliation" designed to retaliate for "prior, protected speech bearing little relation to the criminal offense for which the arrest is made" by "objective evidence." *Id.* Plaintiff fails to make such allegations and simply argues that "governmental intimidation appears to be the entire basis for the Defendants' actions." Pl. Mot. at 14. These unsupported assertions, which ignore the sustained violence directed at federal property and officers, are insufficient to show a likelihood of success on the merits.

Finally, even if Plaintiff could show that federal actions had the specific intent of deterring speech—and she has not—a plaintiff must show then show, even for past violations, that it would "chill or silence a person of ordinary firmness from future First Amendment activities." *Mendocino*, 192 F.3d at 1300. Plaintiff has made no such showing here.

### C.  Plaintiff Has Not Demonstrated Standing for Equitable Relief Based on Future Harm

In addition to failing to demonstrate a past injury, Plaintiff has not alleged a sufficient injury under any theory to justify prospective equitable relief. Even where a plaintiff establishes

that his rights were violated in past incidents, he nonetheless lacks standing to obtain prospective injunctive relief absent a "real and immediate threat" that he will suffer the same injury in the future. *City of Los Angeles v. Lyons,* 461 U.S. 95, 105 (1983). "[P]ast wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy." *Id.* at 103 (citing *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974) and *Rizzo v. Goode,* 423 U.S. 362, 372 (1976)). *See also Nelsen v. King County*, 895 F.2d 1248, 1251 (9th Cir 1990). This "imminence requirement ensures that courts do not entertain suits based on speculative or hypothetical harms." *Lujan*, 504 U.S. at 564. Thus, a plaintiff "who has been subject to injurious conduct of one kind [does not] possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject." *Blum v. Yaretsky*, 457 U.S. 991, 999 (1982). And this aspect of standing cannot be presumed or deferred just because this case is currently being considered on a TRO posture; standing is "an indispensable part of the plaintiff's case" that must be "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561.

The facts and reasoning of *Lyons* are instructive. At issue in *Lyons* was a civil rights action against the City of Los Angeles and several police officers who allegedly stopped the plaintiff for a routine traffic violation and applied a chokehold without provocation. In addition to seeking damages, the plaintiff sought an injunction against future use of the chokehold unless deadly force was threatened. The Supreme Court held that plaintiff lacked standing to seek prospective relief because he could not show a real or immediate threat of future harm.

> That Lyons may have been illegally choked by the police ..., while presumably affording Lyons standing to claim damages ... does nothing to establish a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer or officers who

would illegally choke him into unconsciousness without any provocation or resistance on his part.

*Lyons*, 461 U.S. at 104; *see also O'Shea*, 414 U.S. at 495-96 ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects."); *Rizzo*, 423 U.S. at 372 (holding that plaintiffs' allegations that police had engaged in widespread unconstitutional conduct aimed at minority citizens was based on speculative fears as to what an unknown minority of individual police officers might do in the future).

Courts in this Circuit have applied *Lyons* and *O'Shea* in similar contexts to hold that plaintiffs lack standing to pursue prospective injunctive relief where they were subject to past law enforcement practices but could only speculate as to whether those practices would recur. *See, e.g.*, *Eggar v. City of Livingston*, 40 F.3d 312, 317 (9th Cir. 1994) (plaintiff who had previously been repeatedly detained, charged, and convicted of offenses without court-appointed counsel despite her indigence lacked injunctive standing because whether she "will commit future crimes in the City, be indigent, plead guilty, and be sentenced to jail is speculative"); *Murphy v. Kenops*, 99 F. Supp. 2d 1255, 1259–60 (D. Or. 1999) (plaintiffs lacked standing because it was highly speculative "that the Forest Service will exercise its discretion to issue future closure orders, that the closure orders will violate the First Amendment, that plaintiffs will violate those closure orders, and that plaintiffs will be arrested because of those closure orders"). *See also Curtis v. City of New Haven*, 726 F.2d 65, 68 (2d Cir. 1984) (vacating an injunction that had been entered against police use of mace, because the plaintiffs had not shown a "likelihood that these plaintiffs will again be illegally assaulted with mace"); *Williams v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1267 (11th Cir. 2018) (plaintiff alleging that a school resource officer employed by the police unconstitutionally used an incapacitating chemical spray on her lacked

standing to pursue injunctive relief, because she did not show that a likelihood that the resource officer would again unconstitutionally spray her).

Plaintiff's requested relief fails under these principles.  For starters, Plaintiff has failed to establish that even the handful of prior interactions between law enforcement officers and protesters were unconstitutional.  *Supra* Part I.B.  Moreover, even setting that aside, Plaintiff offers no evidence that such encounters will recur, much less in a manner that would be unconstitutional.  Mere speculation is inadequate, as are allegations of subjective "chill," when "based on a plaintiff's fear of future injury that itself was too speculative to confer standing." *Munns v. Kerry*, 782 F.3d 402, 410 (9th Cir. 2015); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) (plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending"). Plaintiff's requested relief thus fails for lack of standing.

### D.    The Injunction Plaintiff Seeks is Overbroad and Unworkable

There is no basis for the Court to grant Plaintiff's request for an overbroad and unworkable injunction that would micromanage the manner in which federal law enforcement officers respond to dynamic and chaotic situations involving violent protesters seeking to damage federal property and harm federal officers.  "It is not for this Court to impose its preferred police practices on either federal law enforcement officials or their state counterparts." *United States v. Patane*, 542 U.S. 630, 642 (2004).  Yet that is precisely what Plaintiff's requested injunction would do here.  The federal officers protecting federal property in Portland are doing so under difficult circumstances and must make "split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Graham v. Connor*, 490 U.S. 386, 397 (1989).  Those judgments should not be encumbered by the potential threat of contempt of court from a vague, overbroad, and—at bottom—legally improper injunction.  Indeed, Plaintiff

identifies no other case in which federal or state officers responding to large-scale, ongoing incidents by violent actors have been enjoined in the manner Plaintiff proposes here.

It is a basic principle of Article III that "a plaintiff's remedy must be limited to the inadequacy that produced his injury in fact." *Gill v. Whitford*, 138 S. Ct. 1916, 1930 (2018) (quotation omitted). "An injunction must be narrowly tailored to remedy the specific harm shown." *E. Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1029 (9th Cir. 2019) (internal quotations omitted); *see Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir.1991). It "should be no more burdensome to the defendant than necessary to provide complete relief." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

Plaintiff's proposed injunction is legally improper in several respects. First, the requirement that Defendants "immediately cease detaining, arresting, or holding individuals without probable cause or a warrant" is unjustified. To the extent it requires probable cause or warrants where they are legally required, it is the type of vague, "follow the law" injunction that is disfavored because it does not comply with Rule 65(d)'s specificity requirement. *See Cuviello v. City of Oakland*, 2009 WL 734676, at *3 (N.D. Cal. Mar. 19, 2009) (holding unenforceable an injunction that "basically states that Defendants are permitted to make only lawful arrests of Plaintiffs" and are "barred from interfering with Plaintiffs' free speech rights"). As numerous courts have recognized, "[i]njunctions that broadly order the enjoined party simply to obey the law . . . are generally impermissible." *NLRB v. USPS*, 486 F.3d 683, 691 (10th Cir. 2007); *see Burton v. City of Belle Glade*, 178 F.3d 1175, 1200-01 (11th Cir. 1999); *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 240-41 (2d Cir. 2001). Even worse, the proposed injunction would also seem to call into question *Terry* stops, investigatory stops which may be based on "reasonable suspicion" rather than probable cause and which are a standard and important tool of

modern law enforcement.  *See Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt Cty.*,

542 U.S. 177, 185-86 (2004).  Plaintiff's proposed injunction would seem to disable this lawful

investigatory tool.  Yet even in the case Plaintiff cites in support of allowing an injunction (based

on a pervasive policy of rights violations) to prevent "restraining" the plaintiffs without warrant

or lawful arrest, the injunction still allowed for "lawful search and seizure."  *Hague v. Comm. for*

*Indus. Org.*, 307 U.S. 496, 504-05, 517 (1939).

        Second, the injunction would require Defendants to "[i]dentify themselves and their

agency before detaining or arresting any person."  But Plaintiff herself notes that the federal law

enforcement entities involved have publicly identified themselves and, in any event, Plaintiff

provides no legal basis concluding that law enforcement officers must identify their "agency."

*Cf. Doornbos*, 868 F.3d at 584 (suggesting that some circumstances may warrant no

identification at all).

        Third, the requirement that Defendants "[e]xplain to any person detained or arrested that

the person is being detained or arrested and explain the basis for that action" is without any

explanation whatsoever.  Plaintiff devotes no argument to why this is necessary or appropriate.

There is accordingly no basis for entertaining this request.

        Finally, the requested injunction is particularly inappropriate and unmanageable in this

case where law enforcement officers are responding to a dynamic situation involving a consistent

barrage of violent activity targeted against federal property.  DHS, the Marshals Service, and

their officers should not potentially be subject to charges of contempt for violating a vague

injunction in these circumstances.  As the Supreme Court has emphasized, courts must "take care

to consider whether the police are acting in a swiftly developing situation, and in such cases the

court should not indulge in unrealistic second-guessing." *United States v. Sharpe*, 470 U.S. 675, 686 (1985).

## II.      PLAINTIFF CANNOT DEMONSTRATE IRREPARABLE HARM

Plaintiff's allegations on irreparable harm are alone sufficient to deny the request for a temporary restraining order.  Plaintiff relies entirely on speculative assertions of claimed harm, including, for example, that people will allegedly walk downtown in "fear," or lose "faith in law enforcement." Pl. Mot. at 18.  Conclusory assertions like these are insufficient to meet Plaintiff's burden to establish concrete irreparable harm.  Nor is Plaintiff's speculation that federal law enforcement will "escalate confrontations" with protesters.  *Id.*  Indeed, for the same reasons that Plaintiff lacks standing to seek an injunction in the first instance, Plaintiff's future injuries are speculative and, therefore, also insufficient to demonstrate a likelihood of irreparable injury.  As for Plaintiff's claim of "chill[]" of First Amendment rights, that too is inadequate to carry her burden.  *See Rendish v. City of Tacoma*, 123 F.3d 1216, 1226 (9th Cir. 1997) ("no presumption of irreparable harm arises in a First Amendment retaliation claim").

## III.     BOTH THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST WEIGH AGAINST GRANTING AN INJUNCTION

Plaintiff acknowledges that there is a public interest in "allowing the police to do their jobs and to protect lives as well as property."  Pl. Mot. at 19.  But while Plaintiff has not established any violation of Oregonians constitutional rights, the proposed injunction would heavily disturb those important public interests here.[10]

---

[10] The balance of the equities and the public interest are analyzed together here because, when the government is a party, these last two factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

DEFENDANTS' OPPOSITION TO TRO & PRELIMINARY INJUNCTION – 24

Federal agents have deployed to protect various federal properties, including the Hatfield Federal Courthouse and the Edith Green Federal Building, in response to violent rioting.  Rioters have vandalized and threatened to severely damage those buildings, and they have assaulted the responding federal officers.  The government has a comprehensive interest in maintaining public order on public property.  *Feiner v. New York*, 340 U.S. 315, 320 (1951) ("This Court respects, as it must, the interest of the community in maintaining peace and order on its streets.").  There is an even more pointed public interest when disorder threatens the integrity of that public property.  *See United States v. Griefen*, 200 F.3d 1256, 1260 (9th Cir. 2000) ("The clear purpose of the order . . . was for reasons of health and safety, and for the protection of property . . . . These are compelling reasons . . . and certainly represent significant government interests.").  Congress has recognized such interests, including by making the destruction of federal property and the assault of federal officers felonies punishable by up to ten and twenty years of imprisonment respectively.  18 U.S.C. §§ 111, 1361.  Additionally, there is a fundamental First Amendment right of access to the courts, *see, e.g.*, *Ringgold-Lockhart v. Cty. of Los Angeles*, 761 F.3d 1057, 1061 (9th Cir. 2014), which is jeopardized by the breach and destruction of a federal court building; it is in the public interest to prevent the violation of *these* rights, too.  Moreover, the federal government, just as any other property owner, has an interest in "preserv[ing] the property under its control for the use to which it is lawfully dedicated"; for government buildings, those uses are of course public uses that are in the public interest.  *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 679-680 (1992).

On balance, the equities clearly weigh in favor of allowing federal officers to operate free of unnecessary, vague, and burdensome injunctions in the face of events that have turned (and may continue to turn) violent.  *See, e.g.*, *Grayned v. City of Rockford*, 408 U.S. 104, 116 (1972)

("[W]here demonstrations turn violent, they lose their protected quality as expression under the First Amendment"); *Griefen*, 200 F.3d at 1260 (upholding the relocation of protesters who "had already shown by their destructive conduct that they presented a clear and present danger to the safe completion of the construction project, both to other persons as well as to themselves"); *Bell v. Keating*, 697 F.3d 445, 457-58 (7th Cir. 2012) ("[O]therwise protected speech may be curtailed when an assembly stokes—or is threatened by—imminent physical or property damage."). The equities also clearly weigh in favor of allowing them to perform their investigatory functions. *See United States v. Hensley*, 469 U.S. 221, 229 (1985) ("[T]he ability to briefly stop [a suspect], ask questions, or check identification in the absence of probable cause promotes the strong government interest in solving crimes and bringing offenders to justice"). By contrast, requiring federal officers, finding themselves in the midst of violence aimed specifically at them and attempting to detain or arrest violent actors, to recite some specific information and legal conclusions on pain of contempt does not appropriately balance the hardships.

Accordingly, both the public interest and the balance of the equities weigh in favor of denying the injunction.

## **CONCLUSION**

For the foregoing reasons, Plaintiff's motion for a Temporary Restraining Order and Preliminary Injunction should be denied.

Dated: July 22, 2020

ETHAN P. DAVIS
Acting Assistant Attorney General

BILLY J. WILLIAMS
United States Attorney

DAVID M. MORRELL
Deputy Assistant Attorney General

DEFENDANTS' OPPOSITION TO TRO & PRELIMINARY INJUNCTION – 26

ALEXANDER K. HAAS
Director, Federal Programs Branch

BRAD P. ROSENBERG
Assistant Director, Federal Programs Branch

/S/ *Andrew I. Warden*
ANDREW I. WARDEN (IN #23840-49)
Senior Trial Counsel

JEFFREY A. HALL
JORDAN L. VON BOKERN
KERI BERMAN
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20530
Tel.:    (202) 616-5084
Fax:    (202) 616-8470

*Attorneys for Defendants*