IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

**ELLEN ROSENBLUM**,

    Plaintiff,

v.

**JOHN DOES 1-10**; **UNITED STATES DEPARTMENT OF HOMELAND SECURITY**; **UNITED STATES CUSTOMS AND BORDER PROTECTION SERVICE**; **UNITED STATES MARSHALS SERVICE**; and **FEDERAL PROTECTIVE SERVICE**,

    Defendants.

Case No. 3:20-cv-01161-MO

OPINION AND ORDER

**MOSMAN, J.**,

    In the wake of the tragic killing of George Floyd in Minneapolis, international protests have demanded fundamental changes to our criminal justice system, particularly to police culture and tactics. These important protests have, in Portland, centered on a four-block area that includes the U.S. Courthouse, known as the Mark O. Hatfield Courthouse. By virtue of it being a federal building, the law enforcement personnel involved are federal agents.

    One of the most difficult tasks for law enforcement in a free country like ours is to support robust protests while still maintaining order through lawful methods. This is even more challenging when the subject of the protests concerns police tactics. It is not unusual, following

1 – OPINION AND ORDER

major protests, for some of the people involved to allege that the police crossed a line—a constitutional line—in the course of their interactions. It is also common for these interactions to result in lawsuits, with protesters contending the police violated their First and Fourth Amendment rights and seeking redress by money damages and injunctive relief. There is a well-established body of law paving the way for such lawsuits to move forward in federal court.

This is not such a lawsuit. It is a very different case, a highly unusual one with a particular set of rules. In the first place, although it involves allegations of harm done to protesters by law enforcement, no protester is a plaintiff here. Instead, it is brought by the State of Oregon under a rarely used doctrine called *parens patriae*. In the second place, it is not seeking redress for any harm that has been done to protesters. Instead, it seeks an injunction against future conduct, which is also an extraordinary form of relief. Under the governing law for such cases, the State of Oregon must make a very particularized showing in order to have standing to bring a *parens patriae* lawsuit, a task made even more challenging by the nature of the remedy it seeks. Because it has failed to do so—most fundamentally, because it has not shown it is vindicating an interest that is specific to the state itself—I find the State of Oregon lacks standing here and therefore deny its request for a temporary restraining order.

**PROCEDURAL HISTORY**

For about eight weeks, these protests against police brutality and systemic racism have been a nightly occurrence in the area of the Multnomah County Justice Center (which includes the local jail) and the Hatfield Courthouse. At the beginning of July, Acting Secretary of the Department of Homeland Security Chad Wolf announced that his agency would deploy special units of officers to protect federal property. Pl.'s Mot. [5] at 3. Reports from Portland media documented federal officers engaging with protesters at the Hatfield Courthouse as early as July

2. *Id*. Within less than two weeks, reports surfaced that federal officers were "grabbing protesters, pulling them off the sidewalks of downtown, and shoving them into unmarked vehicles." *Id*. The State filed this lawsuit on July 17, seeking to enjoin federal officers from continuing in that practice. The State filed this motion on July 20, with oral argument on July 22. Min. of Proceedings [ECF 17]. I will refer to the alleged interactions between police and protesters as "seizures" for purposes of this opinion because, while it is unclear whether they constitute arrests, detentions, or something else, they are seizures for purposes of the Fourth Amendment.

The State argues that the alleged seizures are unlawful for several reasons: (1) they violate the Fourth Amendment rights of the individuals being seized, (2) they violate those persons' Fifth Amendment due process rights[1], (3) they violate the First Amendment rights of individuals who wish to protest but are discouraged from doing so because they fear being seized, and (4) they constitute a public nuisance. Compl. [1] at 5-8. The State does not further its public nuisance argument in its motion for a restraining order, so I will not consider it in the analysis below.

In the motion before me, the State is seeking a temporary restraining order that would impose three remedies: (1) a requirement that officers identify themselves and their agency before arresting or detaining any person; (2) a requirement that officers explain to any person being seized that he or she is being arrested or detained; and (3) an enjoinder against arrests that lack probable cause. Compl. [1] at 9. The state lists other remedies in its complaint, but as

---

[1] While the State alleges Fourth and Fifth Amendment violations separately, the analysis under both amendments is identical for purposes of this motion. I therefore address the Fifth Amendment claims congruently with the Fourth Amendment.

3 – OPINION AND ORDER

established at oral argument, these are the only remedies at issue in this motion. *Id.*, Draft Tr. at 53-54.

Before I begin my analysis of whether the state should receive its requested restraining order, I will resolve preliminary legal questions that underpin the analysis below.

First, while the complaint paints a picture of numerous protesters being seized from the streets of Portland by unidentified agents, the State's evidence in its brief and at the hearing consists of just two examples.[2] First, it presents two declarations from an individual who claims he was detained by federal officers without probable cause. Pettibone Decl. [ECF 1-1]; Second Pettibone Decl. [ECF 7]. There is no video of this arrest and no evidence relating to its legality other than Mr. Pettibone's sworn statements. Defendants have not refuted the State's allegation that Mr. Pettibone's seizure lacked probable cause. I therefore assume, only for purposes of this opinion, that this seizure was unlawful and constituted a violation of Mr. Pettibone's rights under the Fourth and Fifth Amendments.

As its second example, the State has offered a video, which it states has been circulated heavily online, and which appears to show an individual being seized without any verbal explanation from officers. Potter Decl. [ECF 6] ¶ 6 (*citing to,* Sen. Jeff Merkley, Twitter.com, https://twitter.com/SenJeffMerkley/status/1283852273089683464). The video shows the seizure but does not show any context for what preceded it. It therefore does not speak to probable cause one way or another because it is equally plausible that the individual was an innocent bystander or that he had committed some criminal act just before officers seized him. There is simply no

---

[2] The State initially included a third example, but it withdrew that video because it recorded events that occurred in San Diego. Not. of Withdrawal [ECF 12].

way to know on the record before me, and I am not permitted to assume one way or the other. It is not, for purposes of this opinion, evidence of an arrest that lacked probable cause.

The State argues that, regardless of whether the officers had probable cause for the arrest, the lack of verbal identification from the federal officers renders the seizure unreasonable for purposes of the Fourth Amendment. Pl.'s Mot. [5] at 16-17.[3] Defendants argue that the officers were otherwise identifiable, given their official uniforms and insignia, and that no verbal identification was required. Def.'s Resp. [ECF 15] at 15-16. Whether these seizures are reasonable or unreasonable is a close legal question that I will not answer here. What I will do is assume without deciding that this seizure was constitutionally unreasonable, while stressing that this is <u>not</u> a legal ruling for purposes of future litigation in this case.

Taken together, for purposes of this opinion, the State has presented just one example of an arrest without probable cause and one example of an unreasonable seizure. That is the sum total of the evidence before me that underpins the legal injuries the State asserts in its brief and that I address below. Notably, the State does not request any relief with respect to Defendants' use of unmarked vans, a fact that has been widely reported in both local and national media. *See e.g.* Potter Decl. Ex. 6 [6-1] ("OPB Article"). The use of unmarked vehicles is therefore irrelevant to the legal analysis that follows, and I do not consider that practice at all. The relief sought here has only to do with verbal identification by officers and probable cause, and my analysis focuses on that relief alone.

//

---

[3]    It appears that the State has largely backed away from any argument that the federal agents were not at all identifiable as law enforcement. Mr. Pettibone acknowledges that their uniforms said "Police," Pettibone Decl. [1-1] ¶ 3, and the video shows agents wearing clothing clearly marked as "Police."

**LEGAL STANDARD**

The standard for a temporary restraining order (TRO) is "essentially identical" to the standard for a preliminary injunction. *Chandler v. Williams*, No. CV 08-962-ST, 2010 WL 3394675, at *1 (D. Or. Aug. 26, 2010) (citing *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brushy & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001)). A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012). In order to meet that burden, "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Am. Trucking Ass'ns Inc. v. City of L.A.*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 21 (2008)). In addition to meeting these requirements, as a threshold matter, a Plaintiff must have standing to sue. *See Allen v. Wright*, 468 U.S. 737, 751 (1984).

As standing is the dispositive issue in this case, I take up that analysis first without reaching the question of whether the state has met its burden to prove the merits of its motion for a TRO.

**DISCUSSION**

Two features of this case make the standing analysis unusual. First is the fact that, in a typical case alleging these types of constitutional harms, the aggrieved individual would sue on his own behalf. Here, however, the State of Oregon—by way of Attorney General Ellen Rosenblum—has brought a suit alleging these same kinds of constitutional claims on a theory that they harm the state's citizenry writ large. Second, Oregon does not seek to redress past

harms, as would be the norm in an individual claim of this type, but rather seeks to enjoin future conduct. Both of these features—the identity of the plaintiff and the nature of the requested remedy—render the standing inquiry an unusually high bar to clear.

## I.    *Parens patriae*

Oregon asserts that it has standing to sue on behalf of its citizens under a doctrine known as *parens patriae*. In order to assert *parens* standing, a state plaintiff must plead an injury to its citizenry that meets the usual Article III requirements—that it be "be concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 651 (9th Cir. 2017). It must also meet two special requirements. First, the State must articulate "an interest apart from the interests of particular private parties, *i.e.*, the State must be more than a nominal party." *Id.*, (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez ("Snapp")*, 458 U.S. 592, 607, (1982). Second, "[t]he State must express a quasi-sovereign interest" that has been violated. *Snapp*, 458 U.S. at 607.

The category of interests that qualify as "quasi-sovereign" is relatively broad. It includes, as the two primary categories, the health and well-being of a state's citizens and the state's right not to be discriminatorily denied its rightful status within the federal system. *Snapp*, 458 U.S. at 607. Here, the State has asserted a quasi-sovereign interest in the civic and physical well-being of its people to be free from violations of their constitutional rights, Pl.'s Mot. [5] at 10, and it alleges a series of injuries to its citizenry that implicate that interest.[4]

---

[4]    Defendants argue that a state may never sue the federal government via *parens patriae*. Defs.' Resp. [15] at 10 (citing *Nevada v. Buford*, 918 F.2d 854, 858 (9th Cir. 1990)). The State relies on two district court cases that claim that the Supreme Court's decision in *Massachusetts v. EPA*, 549 U.S. 497 (2007) removed any previous bar to a state suing the federal government via *parens patriae*. *See* Mot. [5] at 9-10 (citing *Aziz v. Trump*, 231 F.Supp.3d 23, 30 (E.D. Va.

7 – OPINION AND ORDER

### a. The Fourth Amendment

At the highest level of abstraction, the State argues that it has a quasi-sovereign interest in protecting its citizens from unlawful seizures. *See* Pl.'s Mot. [5] at 10. This argument is not fleshed out in the briefing, nor did the state do so at oral argument. Presumably, the State's theory is that the State of Oregon is harmed when its citizens are subjected to widespread unlawful seizures of their persons. While it is arguable that this could be a quasi-sovereign interest to support a *parens* theory of standing, it is highly unlikely that it would do so in a case with no more than two identifiable unlawful seizures. But in any event, this argument fails to confer standing for the State to seek an injunction, which I address in greater detail below.

Most specifically, the State asserts a two-part injury to its quasi-sovereign interest in protecting its citizens from unlawful seizures: (1) that Oregonians are at greater risk now of being victimized by genuine kidnappers, and (2) that Oregonians are at a greater risk of violence by the police if they reasonably resist what they believe to be a genuine kidnapping when they mistake federal agents for kidnappers. Pl.'s Mot. [5] at 9. The State's theory is that individuals who oppose the protests could assume the attire of federal police and mimic these unlawful arrests in order to kidnap protesters, thus subjecting them to the risks discussed here. The State reasserted this theory at oral argument, insisting repeatedly that it had an interest in protecting its citizens against the potential for kidnappings, both real and mistaken. This two-prong injury rests on a "public health and welfare" theory of *parens patriae* that seeks to vindicate the

---

2017)). Neither party cites a Ninth Circuit decision that post-dates *Massachusetts v. EPA* which squarely answers this question. However, at least the D.C. Circuit and the Seventh Circuit have concluded that *Massachusetts v. EPA* did not remove the bar that prevents states from suing the federal government in *parens patriae*. *Government of Manitoba v. Bernhardt*, 923 F.3d 173, 181-83 (D.C. Cir. 2019); *Michigan v. EPA*, 581 F.3d 524, 529 (7th Cir. 2009). For the purposes of this opinion, I assume without deciding that the State may sue the federal government in *parens patriae*. If it cannot, such a bar would obviously be fatal to its suit.

constitutional rights of Oregon's citizens, and it meets the requirement that it be independent of the interest of any one individual. It does not, however, satisfy the requirements of Article III because it is purely hypothetical.

In order to sue in federal court, a "constitutional minimum" of standing must be met. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). That minimum requires three elements to be satisfied: (1) the plaintiff must have suffered an "injury in fact"—i.e. an invasion of a legally protected interest that is concrete and particularized, as well as actual or imminent (as opposed to conjectural or hypothetical), (2) there must be a causal connection between the injury and the offending conduct, and (3) it must be "likely" that the injury will be redressed by a favorable decision from the court. *Id*. at 560-61 (internal quotations and citations omitted); *see also Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Plaintiffs bear the burden of proving all three elements. *Lujan*, 504 U.S. at 561.

Oregon's asserted interest fails the first prong of *Lujan* because the injury the state asserts is entirely conjectural. First, the state candidly admits that it does not have a shred of evidence that counter-protesters have ever, anywhere, kidnapped a protester or anyone associated with protests. *See* Draft Tr. at 31. Second, the asserted interest rests on an utterly implausible inference. The State's reasoning is that counter-protesters, once they learn of seizures of protesters by federal agents, will dress up like police and go out on private missions to kidnap protesters. This despite the fact that such kidnappings are Measure 11 felonies in Oregon, punishable by mandatory minimum sentences of up to 70-90 years in prison.[5] I do not discount the animosity among these groups and had I been asked to assume that something would result in fistfights, or theft, or destruction of signs, or damage to vehicles, that would have made sense.

---

[5]   ORS 137.700 (listing Measure 11 crimes and mandatory minimum sentences).

9 – OPINION AND ORDER

But the idea that seizures by law enforcement will lead to kidnappings by private parties is a bridge too far.

I put in a similar category the State's asserted interest in preventing a spate of cases in which protesters mistakenly think the federal agents who are seizing them are actually counter-protest kidnappers. Again, there is no evidence to support such an assertion. The State has not pointed to any instance in which a protester was subjected to state violence because she believed she was resisting a kidnapping. In both instances of a federal seizure it is either admitted or clearly visible that the agents' uniforms say "Police." The State further admitted at oral argument that, to its knowledge, counter-protesters have never dressed up as police. Draft. Tr. at 31.

Finally, the State's asserted interest here fails the third prong of *Lujan*: redressability. The State's requested solution to the kidnapping problem is to require actual federal agents to verbally identify themselves as such, presumably guaranteeing that they are the real deal. But if one is willing to go along with the State's concerns about copycat kidnappers, it requires me to assume that such nefarious characters are willing to dress up like federal agents and willing to commit the very serious crime of kidnapping, but that they would blanch at the thought of identifying themselves as police. The requested remedy here is a linguistic Maginot line, of no use in the real world.

   **b. The First Amendment**

Elsewhere in its briefing, the state also appears to assert three other harms to its citizens that violate its interest in their well-being: (1) a chilling effect upon its citizens' First Amendment rights of free speech and assembly, (2) a diminishment in public confidence in law enforcement, and (3) a significant cost to the state in prosecuting kidnappings after the fact. Pl.'s Mot. [5] at 11. The second and third of these alleged harms must be dismissed for the same

reasons described above—they are both hypothetical, with no evidence in the record to support either of them. In fact, the State did not address its "confidence in law enforcement" theory at oral argument or anywhere in its briefing, other than the passing reference noted here.

The "chilling effect" injury comes closest to satisfying the Article III standing requirements described above. It is the only one of the alleged harms that has any evidentiary support in the record. *See* Pl.'s Decl.'s [ECF 8-11]. At argument, however, the state seemed to assert this interest on the theory that speech would be chilled by the fear of kidnappings. This theory creates a problem under the third prong of *Lujan*, similar to the problem with the State's alleged interest in Fourth Amendment violations, which requires that the alleged harm be redressable by the remedy that a plaintiff seeks. The injury the state asserts—a chilling of its citizens' speech—is not actually redressable by the requested remedy, given that citizens could still believe they might be kidnapped even if police are required to verbally identify themselves. Apparently, the word "police" and other official insignia on uniforms has not quelled this fear among the public, and it is highly questionable whether the requested relief would do so either.

More fundamentally, the "chilling effect" injury presents a problem for the State under the *parens patriae* doctrine. While the state has asserted a quasi-sovereign interest in the civic well-being of its citizens, and the "chilling effect" injury is a violation of that interest, *parens patriae* also requires that the state's interest be more than a nominal interest in an individual dispute. *See Snapp*, 458 U.S. at 600-01. In other words, it must be a harm to the state and its citizens more broadly. *Id*. This is the problem with the "chilling effect" injury.[6] Oregonians, like

---

[6] The State's argument also presents significant weaknesses as far as proving Defendants' intent to use unlawful seizures as a means to quell the protests, particularly in light of the State's concession at oral argument that no statement to that effect exists anywhere in this record. *See* Draft Tr. at 25-26.

11 – OPINION AND ORDER

all Americans, have individual rights to freedom of speech and assembly, conferred by the First Amendment. They can, and often do, bring individual lawsuits to vindicate those rights. And the State of Oregon has not explained why this case is different, why the chilled speech it alleges here injures the state in a way that is distinct from the individual harms that it also alleges. Perhaps there is an argument or a theory that could draw this distinction. The State did not manage to do so in its briefing or at oral argument, and I find that this interest, while it may or may not satisfy Article III, does not satisfy the requirements of *parens* standing.

## II.     Injunctive Relief

Even assuming arguendo that the State had pleaded *parens patriae* standing, it does not have standing to seek the specific remedy it requests. Through its motion, Oregon seeks a temporary restraining order that would require Defendants to identify themselves and their agency before detaining or arresting any person off the streets in Oregon; explain to any person being arrested or detained that she is subject to arrest or detention and explain the basis for the seizure; and to refrain from arresting protesters without probable cause or a warrant. Pl.'s Mot. [5] at 20; Compl. [1] at 9. Even if the State had *parens* standing to vindicate broadly its citizens First and Fourth Amendment rights, or standing on a theory of one of the more specific injuries discussed above, any formulation of its quasi-sovereign interest would fail to confer standing to seek an injunction because every theory rests, fundamentally, on the idea that the unlawful seizures described above violate citizens rights. The State simply does not have enough evidence that those unlawful seizures are likely to continue.

Standing is a remedy-specific inquiry. *See Lyons v. City of Los Angeles*, 461 U.S. 95, 105, 109 (1983) (holding that the plaintiff had standing to pursue damages for his past injury but lacked standing to pursue injunctive relief to prevent future harm). "Past exposure to harmful or

illegal conduct does not necessarily confer standing to seek injunctive relief if the plaintiff does not continue to suffer adverse effects." *Mayfield*, 599 F.3d at 970 (citation omitted). In other words, injunctive relief requires more than a showing that a plaintiff has been harmed; it requires a showing that she will likely be harmed again. *Lyons*, 461 U.S. at 111 ("[An injunction] is unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again in a similar way.").

This case is nearly on all fours with *Lyons*. In that case, the plaintiff was subjected to a chokehold by City of Los Angeles police officers, and he sought injunctive relief to prevent them from using chokeholds in the future. *Lyons*, 461 U.S. at 97-98. The United States Supreme Court held that he could not seek injunctive relief because he had no evidence that he would be subject to an unconstitutional chokehold again. *Id*. at 105-6. The court provided two primary examples of how a plaintiff could show the required "real or immediate threat that [he] will be wronged again:" either, "(1) that *all* police officers in Los Angeles *always* choke any citizen with whom they happen to have an encounter, whether for the purpose of arrest, issuing a citation or for questioning or, (2) that the City ordered or authorized police officers to act in such manner." *Id*. at 106.

The same is true here. The state has alleged that the purportedly illegal seizures by Defendants have caused an injury to its citizens' rights to speech and assembly. In other words, the State must show that the illegal seizures—analogous to the chokeholds in *Lyons*—will occur again in the future. The State could try to show, for example, that all of Defendants' seizures are illegal, or that they are under orders to fail to identify themselves or to make random arrests without probable cause. The state has shown none of this. It has presented no evidence of any

official orders or policies and has presented no evidence that these allegedly illegal seizures are a widespread practice. Despite the broad language in the complaint, Oregon has shown—at most—that this type of seizure has happened twice.[7] At oral argument, when asked what evidence it could present to show the likelihood of future harm, the state pointed to the fact that Defendants have defended against this lawsuit. Tr. at 39-40. Not only is defending a lawsuit not evidence of constitutionally unlawful behavior, it is not sufficient to support the showing the state is required to make under *Lyons*.

The State's argument, regardless of how it is framed, rests on too little evidence to satisfy *Lyons*. The State has not met its burden to show that it has standing to seek injunctive relief, and I find that it does not have that standing. The State's motion is therefore denied, as a temporary restraining order is unavailable on the record presented here.

## CONCLUSION

For the reasons described above, Plaintiff's Motion for a Temporary Restraining Order [5] is DENIED.

IT IS SO ORDERED.

DATED this 24th day of July, 2020.

                                                        s/ Michael W. Mosman
                                                        MICHAEL W. MOSMAN
                                                        United States District Judge

---

[7] In its briefing and at oral argument, the State described what has happened here in Portland as "disappearance squads" and "disappearing" people. Pl.'s Mot. [5] at 4; Draft Tr. at 24. This is apparently a reference to "the Disappeared," i.e., the 30,000 people who were tortured and murdered by the Argentine military junta 40 years ago. Even taking every word of the State's arguments and evidence at face value, this seems out of proportion.